**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**THOR POWER TOOL COMPANY, Respondent.**

**No. 14972.**

United States Court of Appeals
Seventh Circuit.

Oct. 8, 1965.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Michael N. Sohn, Atty., N. L. R. B., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Gary Green, Atty., N. L. R. B., Washington, D. C., for petitioner.

Edward R. Lev, Chicago, Ill., for respondent, Mayer, Friedlich, Spiess, Tierney, Brown & Platt, Chicago, Ill., of counsel.

Before CASTLE, KILEY, and SWYGERT, Circuit Judges.

SWYGERT, Circuit Judge.

The National Labor Relations Board requests enforcement of its order directed against Thor Power Tool Company, Aurora, Illinois. The order directed an employee's reinstatement with back pay. It was based upon a finding that the company had discharged Donald Tinsley for engaging in protected activity in violation of section 8(a) (1) and (3) of the National Labor Relations Act. The principal question is the correctness of the Board's determination of the motive for the discharge. The Board's decision is reported at 148 N. L. R. B. No. 131.

Tinsley was a "grievance committeeman" for the union,[1] whose function it

---

1. Local 236, International Association of Machinists.

was to assist other employees in the presentation of their grievances to the company. On September 20, 1963, employee George Bloom informed Tinsley that his timecard had been improperly altered by a company foreman in such a way as to deprive him of twenty minutes' pay. Tinsley, Bloom, and another grievance committeeman, Bob Gordon, confronted company superintendent George Russell with this problem in the latter's office.

In the ensuing discussion, Russell questioned the accuracy of Bloom's charges and deprecated his overall work record. Tinsley, who took an active part in the conference, defended the employee and sought to limit the exchange to the timecard matter. During the course of this investigation, Russell's temper began to flare. On several occasions, in progressively louder tones and climaxed by an obscene epithet, he objected to committeeman Tinsley's participation. The obscenity finally convinced Tinsley that Russell's attitude precluded any relief at that level and, so affirming, he proposed to end the meeting. As the employees were leaving the office, Russell overheard Tinsley mumbling something to Gordon. Distinguishing the words "the horse's ass," Russell diagnosed that they had been directed at him, hastened after Tinsley, and summarily discharged him.

The union subsequently filed a grievance with respect to Tinsley's discharge, which proceeded through several stages of the contractual grievance procedure but which was finally abandoned when Tinsley filed an unfair labor practice charge with the Board.

■ The trial examiner, after reviewing the evidence, concluded that "Tinsley was in fact engaging in an activity protected by the statute while he was discussing the grievance with Russell, and Tinsley's comment on leaving the office was so directly related to the grievance meeting as to be, in effect, a part thereof." The Board agreed with the examiner, then added a conclusion of its own:

We do not believe, on the basis of the entire record, that Tinsley was terminated solely because he used the derogatory term. Rather, we are satisfied that Russell's rising anger was directed to Tinsley throughout the grievance discussion because of Tinsley's participation in and conduct of the grievance meeting. The final explosion which resulted in Tinsley's discharge was the culmination and product of the grievance discussion, rather than the result of Tinsley's comment. As such it was part and parcel of Russell's anger at Tinsley for his vigorous participation in the grievance proceeding. Accordingly, we are of the opinion that Tinsley was in fact discharged because he participated in the presentation of the grievance, clearly a protected activity and that it was violative of Section 8(a) (3) of the Act.

We are convinced that when the entire record is considered there was substantial evidence to support the Board's finding that Tinsley's discharge was the result of his having presented a grievance to the management.

There is no doubt about Russell's resentment of Tinsley's vigorous presentation of Bloom's grievance. His mounting anger culminated in his saying to Tinsley, using an obscene word, "shut your . . . . . mouth." During the entire episode Tinsley remained calm and endeavored to keep the discussion focused on the grievance despite Russell's efforts to argue about extraneous matters. After it became obvious that the superintendent had lost control of himself, Tinsley said that the grievance would have to be presented at a higher level. He and Gordon started to leave Russell's office. It was then that Tinsley uttered to Gordon the uncomplimentary remark about Russell. It is within this factual context that we must view the action of Russell in discharging Tinsley.

Respondent argues that Tinsley's remark must be separated from what led up to it; however, the remark cannot be considered in a vacuum. Respondent also argues that Russell's testimony that he

discharged Tinsley solely because of the remark should be conclusive. But a contrary inference is warranted. Tinsley's derogatory remark undoubtedly triggered his discharge; however, Russell's extreme displeasure of Tinsley's participation in the grievance was clearly evident. Therefore, we think the evidence supports the Board's determination that Tinsley's remark furnished the excuse rather than the reason for Russell's retaliatory action.

As other cases have made clear, flagrant conduct of an employee, even though occurring in the course of section 7 activity, may justify disciplinary action by the employer. On the other hand, not every impropriety committed during such activity places the employee beyond the protective shield of the act. The employee's right to engage in concerted activity may permit some leeway for impulsive behavior, which must be balanced against the employer's right to maintain order and respect. N. L. R. B. v. Illinois Tool Works, 153 F.2d 811 (7th Cir. 1946). Initially, the responsibility to draw the line between these conflicting rights rests with the Board, and its determination, unless illogical or arbitrary, ought not be disturbed. In the instant case we cannot say that the Board's conclusion that Tinsley's remark was within the protection of section 7 was either unreasonable or capricious.

A second issue is raised by respondent's contention that the Board should have withheld its processes because the charging party, Tinsley, through his union had invoked and then abandoned the grievance procedures provided in the collective bargaining agreement between the union and the company. It is true that on occasion the Board has deferred action where the charging party has not resorted to available grievance procedures. Montgomery Ward & Co., 137 N.L.R.B. 418 (1962); Hercules Motor Corp., 136 N.L.R.B. 1648 (1962). Section 10(a) of the act, however, provides: "The Board is empowered * * to prevent any person from engaging in any unfair labor practice * * *. This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise:" In those cases where the facts create both an arbitrable dispute and a possible unfair labor practice, the Board has discretion to issue a complaint or to defer action until an arbitration has been completed. "The superior authority of the Board may be invoked at any time." Carey v. Westinghouse Elec. Corp., 375 U.S. 261, 272, 84 S.Ct. 401, 409, 11 L.Ed.2d 320 (1964).

The Board's order will be enforced.