# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 09-2296

DONALD J. FORMELLA,

*Petitioner,*

*v.*

UNITED STATES DEPARTMENT OF LABOR,

*Respondent,*

and

SCHNIDT CARTAGE, INC.,

*Intervening Respondent.*

Petition for Review of an Order of
the Occupational Health and Safety Administration.
No. 2006-STA-035

ARGUED NOVEMBER 30, 2009—DECIDED DECEMBER 10, 2010

Before KANNE, ROVNER, and WILLIAMS, *Circuit Judges*.

ROVNER, *Circuit Judge*. Truck driver Donald J. Formella was fired by Schnidt Cartage, Inc. ("Schnidt") after he raised safety concerns about the truck that Schnidt had assigned him to drive. Formella filed a complaint with

the Department of Labor's Occupational Safety and Health Administration ("OSHA") alleging that Schnidt fired him in retaliation for his safety-related complaints, in violation of Section 405 of the Surface Transportation Assistance Act of 1982, P.L. No. 97-424, 96 S. Stat. 2097 (Jan. 6, 1983) ("STAA"). *See* 49 U.S.C. § 31105. An administrative law judge ("ALJ") found that Schnidt discharged Formella not because he refused to drive a vehicle that he believed to be unsafe but rather "because of his provocative, intemperate, volatile, and antagonistic conduct" in expressing his concerns. *Formella v. Schnidt Cartage, Inc.*, ALJ No. 2006-STA-035, Recommended Decision and Order 10 (ALJ Jan. 30, 2008) ("ALJ Dec."). An administrative review board ("ARB" or the "Board") sustained the ALJ's decision. *Formella v. Schnidt Cartage, Inc.*, ARB No. 08-050, 2009 WL 891350 (ARB Mar. 19, 2009) ("ARB Dec."). Formella seeks review of the ARB's decision, contending that the Board erred in failing to apply the more employee-friendly provisions added to the statute in 2007 and that, in any case, his conduct, even if it was as confrontational as Schnidt claims it was, did not exceed the leeway to which employees complaining of unsafe practices are entitled. We deny the petition for review.

**I.**

Although Schnidt's witnesses and Formella gave dramatically different accounts of what transpired on the day he was fired, the parties do agree on this much: Formella was dissatisfied with the condition of the truck

he was assigned to drive, he expressed his safety-related concerns to his superiors at the company, and he was fired at the conclusion of his encounter with those individuals. Where the witnesses diverged is on what Formella said to his superiors and his tone and demeanor in doing so. The conflicts in the witness accounts presented classic credibility questions for the ALJ to resolve. But before we reach the decisions of the ALJ and the Board, we shall briefly summarize the evidence that was presented to them.

Formella was fired after he reported for work on February 23, 2006. Although he had over forty years of experience as a truck driver, Formella had been driving for Schnidt for less than five months. Schnidt is a cartage company that transports freight within a fifty-mile radius of Chicago; it employs some twenty-six drivers. Schnidt owns roughly one half of the trucks in its fleet; the rest are leased from Penske Truck Leasing. The fleet on the whole is older, and minor problems occur with one or more trucks on a daily basis. Schnidt has a mechanic on site to handle minor repairs, including repairs to the leased vehicles. If one of the Penske trucks requires a major repair, it is sent either to Penske or to an outside mechanic.

On the morning of February 23, Formella arrived for work and clocked in at 7:13, ahead of his scheduled start time of 7:30 a.m. Shortly after his arrival, Schnidt Vice-President Linda Markus held a meeting with Formella and several other drivers in which she spoke out against pending efforts to unionize them: if those efforts were

successful, she warned, the company's owner would "close the doors." Tr. 86, 90. Following that meeting, Formella proceeded to the truck he had been assigned to drive that day.

When Formella inspected the truck, several things caught his attention. First, the truck was not the one he had been driving for most of his tenure with Schnidt. That truck, like its replacement, was a Penske rental; and it was not unusual for Penske to recall a vehicle from Schnidt's fleet either because the lease period was concluding or because Schnidt wanted to sell the truck to a third party. The truck formerly assigned to Formella had been swapped out the night before, without forewarning to Formella. Second, the requisite permits from the Department of Transportation, which were supposed to be kept in the truck at all times, were missing. Third, the truck's high-beam headlights were not working, and one or more of the reflectors or lights on the rear of the truck were missing or inoperative. Fourth, and most important as it would turn out, the rear or "drive" tires on the truck had mismatched tread patterns. Based upon the knowledge he had acquired from his experience, from trucking magazines, and from federal regulations, Formella was concerned that the mismatch could result in "what they call a traction spitout," Tr. 31, which "could cause sliding, and loss of control of the vehicle" in wet or snowy conditions. Tr. 31; *see also* Tr. 33. In conditions of extreme heat, on the other hand, the mismatch might prevent the tires from cooling, such that "[t]he tire would actually overheat and blow." Tr. 34.

Formella testified that once he noticed the problems with the lights and tires of his assigned truck, he went into the dispatch office. After he reported the problems to the dispatcher, the dispatcher informed him that Markus wished to see him in her office. Formella went to her office as requested and a discussion ensued. Paul Landowski, who was responsible for the purchasing, leasing, maintenance and safety of Schnidt's fleet, came into Markus's office at some point during that conversation, and Formella indicated that he believed the truck was out of compliance with federal and state regulations in view of the inoperative headlights and reflector and the mismatched tire treads. Markus advised him that if he was unhappy with his job, he could quit. When Formella refused to resign, Markus fired him. Formella testified that he never stood up or raised his voice at any time during this encounter, which was the one and only interchange he had with Markus on the morning of his discharge.

Markus portrayed events on the morning of Formella's discharge quite differently. She testified that she had three successive exchanges with him on that day: First, Formella came to the dispatch office questioning his truck assignment, and either Markus or the dispatcher advised him that he had been assigned a different truck from the one he had been driving. Five or ten minutes later, Formella came back into the office to report that there were no permits in the truck, which Markus then supplied to him. Approximately fifteen minutes later, Formella came into the office a final time to voice his safety concerns about the truck. It was this third exchange, according to Markus, that culminated in his discharge.

Markus described Formella as "very boisterous" when he re-entered the office complaining about the problems with the lights and tire treads on his truck. Tr. 68. Markus, who was standing at the dispatch window speaking with the dispatcher and another driver, Charles Miehle, summoned Formella into her office. She asked Landowski to join them. Landowski left Markus's office at one point during the ensuing discussion to telephone Penske about the tire treads and to have Schnidt's mechanic fix the lights on Formella's truck. Markus said that Formella became both "louder" and more "vehement" during the discussion, Tr. 72, 73, so much so that at one point employees in the building's warehouse came running into the office area to see what the commotion was and whether someone needed help. Tr. 128. "Everybody heard the shouting," Markus testified. Formella, according to Markus, also criticized Landowski's competence. Markus advised Formella that if he was so unhappy, he might consider working elsewhere. Formella, in return, "kept pushing and getting more and more volatile and agitated," Tr. 127, repeatedly asking Markus, "[A]re you telling me I'm fired?" Tr. 73. Ultimately, based on Formella's "volatile condition, . . . his anger, [and] his unstableness," Tr. 74, Markus did fire Formella. *See also* Tr. 143. She acknowledged that he made no threatening remarks and remained seated (albeit on the edge of his seat) during their discussion; nonetheless, she felt "[a] bit threatened" by his tone and demeanor. Tr. 73.

Landowski's account was consistent with Markus's. Landowski testified that when he was summoned to

Markus's office, Formella was already there. Landowski described Formella as "very upset" and "almost hostile" to him. Tr. 150. "[I]t was very, very loud in that office," Landowski testified. Tr. 150. Formella insisted that it was both illegal and unsafe to operate a truck with mismatched treads. Landowski was sitting close to Formella and, according to Landowski, Formella "got right into my face" as he was speaking. Tr. 167; *see also* Tr. 150. After responding that he did not believe the mismatched treads posed a safety problem, Landowski stepped out of Markus's office for a moment and returned to his own in order to telephone Penske for that company's input. While he was there, he also radioed Schnidt's mechanic and asked him to deal with the "light situation" on Formella's truck. Tr. 151. Landowski subsequently returned to Markus's office and reported that Penske believed the truck safe to drive despite the mismatched treads. Formella insisted that both Penske and Landowski were wrong, that "this is illegal," and that he "[couldn't] be driving a vehicle like that." Tr. 151. Formella was also upset that his old truck had been returned to Penske still bearing the CB radio antenna that he had attached to the truck. Landowski testified that Formella was "very red in the face" and "very close" to his own face and that, like Markus, he felt threatened by Formella. Tr. 152; *see also* Tr. 167. At the same time, he believed that Formella's complaint about the mismatched treads was borne of his genuine concern about the safety of the truck. Markus at some point told Formella that he should leave if he was dissatisfied with Schnidt. Formella reiterated his belief

that there was "something wrong" with the truck and that Landowski knew it. Tr. 153. "And at that point, this was very loud, and at that point, Linda told him, Don, I think that's it. You're let go from this company." Tr. 153.

Two additional employees of Schnidt, each of whom said that he had an encounter with Formella on the morning of his discharge, testified as witnesses for Schnidt. Both described his behavior as hostile.

Truck driver Charles Miehle testified that when he and Formella walked past one another, shortly after the meeting at which Markus spoke out against efforts to unionize the drivers, Formella said to him loudly, "[I]t's your fault." Tr. 212. A discussion ensued between the two men about the possibility of a union. When Miehle indicated that he was not interested, Formella inquired of Miehle, "[I]f I'm . . . going to put a contract under your nose, you're not going to sign the contract?" Tr. 213. Miehle told him no. "I said it's never going to happen." Tr. 213; *see also* Tr. 231. According to Miehle, Formella was "in [his] face" during the conversation and was "acting a little off," almost "out of control." Tr. 249, 252. Miehle felt that the encounter "could have escalated real easy," Tr. 252, so he walked away from Formella. According to Miehle, Formella's tone and manner in asking Miehle about the possibility of a union contract made it seem more like a threat than a question. Tr. 232, 233, 250, 252. And to Miehle, it was "a vile threat." Tr. 253. Miehle had lived through organizing disputes before and had experienced first hand the workplace hostility, threats, and sabotage that sometimes occur in such dis-

putes. Miehle found himself pacing the truck yard and growing red in the face. In fact, he was so unsettled by his encounter with Formella that he resolved to ask for the day off. He discussed the incident with the dispatcher, who suggested that he go into the dispatch office to calm down. He was doing just that five minutes later when he witnessed Formella walk into the dispatch office "making a lot of noise and ruffling a lot of feathers in there." Tr. 214; *see also* Tr. 239.

Driver Richard Osten had just arrived for work that morning when he saw Formella exit his truck and walk toward the dispatch office. Formella had parked his truck in such a way that it was blocking the path of another driver who was attempting to leave the lot. Osten asked Formella whether he was going to move his truck, but Formella simply gestured and walked on, so Osten took it upon himself to move Formella's truck. When Formella came out of the dispatch office and saw Osten getting out of his vehicle, he was furious. "[H]e said don't ever get in my fucking truck or I'll kill you," Osten recalled. Tr. 180. "[H]e was up in my face and very loud about it . . . ." Tr. 180. Osten said that Formella appeared "dead serious" in threatening him. Tr. 196. Osten decided that they ought to discuss the matter with Markus, and he followed Formella back into the dispatch office for that purpose. But before Osten could say anything about the contretemps, Formella started "yelling and screaming about the tires" to Markus, Tr. 200, leaving Osten unable "to get a word in edgewise," Tr. 199; *see also* Tr. 180-81. Markus took Formella into her office. This was evidently the last of the three encounters that Markus had with Formella that day.

Having heard the testimony, the ALJ credited Schnidt's witnesses over Formella as to the manner in which he voiced his safety concerns. Although the judge found Formella's testimony "generally credible," ALJ Dec. 2, and did not doubt that he had genuine concerns about the safety of his assigned truck, the ALJ discredited certain key aspects of Formella's version of events, including his testimony that he never raised his voice during his conversations with Markus and Landowski, that he voiced his safety concerns (and was discharged) in a single conversation with these management officials rather than the several conversations that Markus described, and that he did not have an encounter with either Miehle or Osten on the morning of his discharge. The judge found that Formella had, in fact, had serial discussions with Markus and ultimately Landowski as well, that he had altercations with both Miehle and Osten during the same time frame, and that he had "storm[ed] into the dispatch office, yelling, antagonizing, and provoking his superiors, by questioning their capabilities, and repeatedly asking if he was fired . . . ." ALJ Dec. 11. In finding the defense witnesses more credible on these points, the ALJ noted that Markus and Landowski had given consistent testimony concerning Formella's demeanor and temperament in his interactions with them, the veracity of which he found to be reinforced by the testimony of Miehle and Osten concerning their own dramatic encounters with Formella that same day.

Although the ALJ readily agreed that Formella engaged in activity protected by the STAA when he

refused to drive the truck that had been assigned to him based on his concerns about the safety of the vehicle, and further that Formella had suffered an adverse employment action when he was discharged on the heels of that protected activity, the judge also found that it was Formella's inappropriate behavior in complaining about the condition of the truck rather than the fact of his complaints which was the basis for his discharge. "I conclude that Complainant was not terminated because of his protected activity. Rather he was terminated because of his provocative, intemperate, volatile, and antagonistic behavior." ALJ Dec. 10.

The judge credited Markus's testimony in this regard despite his acknowledgment that she had not given wholly consistent accounts of her reasons for terminating Formella. In opposing the claim for unemployment compensation that Formella filed after he was fired, Markus had cited his behavior toward Miehle and Osten as the basis for his termination. Yet, Markus later acknowledged that she did not learn of Formella's altercation with Miehle until *after* she had already discharged Formella, and the judge believed it unlikely that Markus knew anything about Formella's encounters with Osten either when she fired Formella. At the hearing before the ALJ, Markus testified that it was Formella's behavior during his discussions with her and with Landowski that led her to fire him. The ALJ credited that later testimony despite the conflict with her earlier position, noting that the encounters Formella had with Markus, Miehle, and Osten occurred closely in time, and "it is reasonable that she could perceive the entire sequence of

events that morning as a single incident or fail to correctly remember the sequence of when she became aware of each event that occurred that morning." ALJ Dec. 11 (footnote omitted).

The judge acknowledged that an employee like Formella with a safety-related complaint should be given some leeway for impulsive behavior in pursing that complaint, but added that this leeway did not include the right to engage in insubordinate and disruptive behavior. ALJ Dec. 11. "'An employee's entitlement to submit a complaint about a vehicle's safety would not mean that the employee was similarly entitled to attach the complaint to a rock and throw it through his supervisor's window.'" ALJ Dec. 10 (quoting *Harrison v. Admin. Review Bd., U.S. Dep't of Labor*, 390 F.3d 752, 759 (2d Cir. 2004)). In the judge's view, that is effectively what Formella did when he barged into the dispatch office and proceeded to antagonize and provoke Markus and Landowski. "While Complainant may have acted in response to legitimate safety concerns, his behavior far exceeded any leeway to which he was entitled." ALJ Dec. 11.

Formella appealed the ALJ's decision to the Administrative Review Board, which affirmed. 2009 WL 891350. The ARB had no quarrel with the ALJ's finding that Formella, because he had a reasonable apprehension that he might lose control of the truck due to the mismatched tire treads, engaged in STAA-protected activity by refusing to drive the vehicle and that he suffered an adverse employment action when he was dis-

charged. But the Board found substantial evidence supporting the ALJ's further finding that Formella's intemperate behavior exceeded the leeway to which he was entitled in raising his safety concerns. It cited the testimony of Markus and Landowski as to Formella's demeanor and tone, as well as the testimony of Miehle and Osten in corroboration of the fact that Formella was angry and upset that morning. Like the ALJ, the Board rejected the notion that Markus's change in explanation as to her reason for firing Formella—from his confrontations with Osten and Miehle to his confrontation with her and Landowski—compelled the conclusion that her stated rationale was pretextual. Even if Markus was embellishing when she referred to the Osten and Miehle confrontations when she opposed Formella's claim for unemployment compensation, the Board reasoned, substantial evidence nonetheless supported Schnidt's contention that he was discharged for his "loud and threatening conduct, not for his protected activity." *Id.* at *4.

## II.

Section 405 of the STAA protects a commercial truck driver from being discharged, disciplined, or otherwise penalized because he has refused to operate a vehicle that does not comply with the safety- and health-related rules applicable to commercial motor vehicles or because he has a reasonable apprehension of serious injury to himself or to the public because the vehicle is unsafe to

operate. 49 U.S.C. § 31105(a)(1)(B)(i) and (ii).[1] "Congress recognized that employees in the transportation industry are often best able to detect safety violations and yet, because they may be threatened with discharge for co-operating with enforcement agencies, they need express protection against retaliation for reporting these violations." *Brock v. Roadway Express, Inc.*, 481 U.S. 252, 258, 107 S. Ct. 1740, 1745-46 (1987). A worker who believes his employer has retaliated against him for engaging in protected activity may file a complaint with the U.S. Department of Labor's Occupational Safety & Health Administration. The Department of Labor conducts an investigation to determine whether there is probable cause to believe that the anti-retaliation provision of the STAA has been violated. Either party has the right to object to this initial finding and to request a hearing before an ALJ. After conducting such a hearing, the ALJ issues a decision and order, which is subject to review by the ARB, to whom the Secretary of Labor has delegated

---

[1] The statute also protects an employee who has "filed a complaint . . . related to a violation of a commercial motor vehicle safety or security regulation, standard, or order . . . ." § 31105(a)(1)(A)(i). However, this provision may not reach Formella's complaint, which was oral rather than written. *See Kasten v. Saint-Gobain Performance Plastics Corp.*, 570 F.3d 834 (7th Cir. 2009) (intracompany complaints are covered by "filed any complaint" language of Fair Labor Standards Act's anti-retaliation provision, 29 U.S.C. § 215(a)(3), but such complaints must be in writing in order to be deemed "filed"), *reh'g en banc denied over dissent*, 585 F.3d 310 (7th Cir. 2009), *cert. granted*, 130 S. Ct. 1890 (2010).

her final decisionmaking authority in such cases. *See* 29 C.F.R. § 1978.109(c)(1). The decision of the ARB is in turn subject to review in the appropriate court of appeals. *See* 49 U.S.C. § 31105(d).

We have noted that the STAA prohibits an employer from taking adverse action against an employee "because" he has engaged in a form of activity that the statute protects. § 31105(a). Standing alone, that language would require the complaining employee to show that his protected conduct was a but-for cause of the discharge or other penalty imposed on him. *See Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343 (2009); *Serafinn v. Local 722, Int'l Brotherhood of Teamsters*, 597 F.3d 908, 915 (7th Cir. 2010); *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 961-62 (7th Cir. 2010); *Fairley v. Andrews*, 578 F.3d 518, 525-26 (7th Cir. 2009), *cert. denied*, 130 S. Ct. 3320 (2010). However, the statute was amended in 2007 to incorporate the legal burdens of proof set forth in the whistleblower provision of the Wendall H. Ford Aviation Investment and Reform Act for the 21st Century, 49 U.S.C. § 42121(b)(2)(B) ("AIR 21"). *See* 49 U.S.C. § 31105(b). Under the AIR 21 provision, a complainant need only make a prima facie showing, by a preponderance of the evidence, that his protected activity was a contributing factor in the adverse action taken against him; in the face of such proof, the employer must demonstrate by clear and convincing evidence that it would have taken the same action against the complainant in the absence of his protected activity. § 42121(b)(2)(B)(i) and(iv); *see Harp v. Charter*

*Commc'ns, Inc.*, 558 F.3d 722, 723 (7th Cir. 2009) (inter-preting Sarbanes-Oxley Act, 18 U.S.C. § 1514A(b)(2)(C), which like STAA, incorporates burdens of proof set forth in AIR 21). The statute as amended is thus more favorable to the complaining employee. *See Addis v. Dep't of Labor*, 575 F.3d 688, 690-91 (7th Cir. 2009) (discussing comparable language of Energy Reorganization Act, 42 U.S.C. § 5851(b)(3)(C)-(D)).

Formella has forfeited his belated contention that the evidence should be evaluated under the statute as amended. The statute was modified after the hearing before the ALJ concluded, but nearly six months before the ALJ rendered his decision. Yet, Formella did not ask the ALJ to consider the applicability of the amend-ments to his complaint, and the ALJ applied the statute in its pre-amendment form. The ARB, in turn, noted that the statute had been amended but, in the belief that the amendments were irrelevant to the issues presented, abstained from deciding whether they applied to this case. 2009 WL 891350, at *1 n.1. For his part, Formella did not argue to the ARB that it should apply the statute in its amended form. Only in this court has Formella raised the new burdens of proof specified by the amend-ments and contended that he should enjoy their benefit. It is far too late in the day to be making this contention. The proceedings in the Department of Labor were ad-versarial, and in an adversarial setting it is reasonable to expect the parties to raise and develop any issues that they want the ALJ and the ARB to address, on pain of forfeiting any issues that they do not mention. *See Sims v. Apfel*, 530 U.S. 103, 109-10, 120 S. Ct. 2080, 2085 (2000)

("Where the parties are expected to develop the issues in an adversarial administrative proceeding, it seems to us that the rationale for requiring issue exhaustion is at its greatest."); *id.* at 112-13, 120 S. Ct. at 2086 (O'Connor, J., concurring) ("In most cases, an issue not presented to an administrative decisionmaker cannot be argued for the first time in federal court. On this underlying principle of administrative law, the Court is unanimous."); *id.* at 114, 120 S. Ct. at 2087 (Breyer, J., dissenting) ("Under ordinary principles of administrative law a reviewing court will not consider arguments that a party failed to raise in timely fashion before an administrative agency."). As we are not convinced that any manifest injustice will result from applying the statute as it stood prior to the 2007 amendments, we may set the amendments aside. *See Russian Media Group, LLC v. Cable Am., Inc.*, 598 F.3d 302, 308 (7th Cir. 2010). Formella was therefore obliged, consistent with the pre-amendment version of the statute, to prove that he would not have been discharged had he not engaged in activity that is protected by the STAA.[2]

---

[2] The ALJ found that Formella engaged in protected conduct by refusing to drive his assigned truck based on his reasonable apprehension that the mismatched tire treads posed a serious danger to himself or to the public. We note that both Markus and Landowski denied having ever ordered Formella to drive the truck despite his concerns; and Osten and Miehle testified that when a driver was dissatisfied with the condition of his assigned vehicle, Schnidt would arrange for a

(continued...)

Apart from his forfeited argument as to the statutory framework that the ALJ and the Board applied in their examination of the evidence, Formella has not contested the evidentiary support for the ALJ's determination that Schnidt fired him based on his behavior in complaining about the truck rather than on the exercise of his right to voice safety-related concerns. Nor could he reasonably make such a challenge. A finding as to an employer's true reason for discharging an employee is a factual determination, *see, e.g.*, *Burnett v. LFW Inc.*, 472 F.3d 471, 482 (7th Cir. 2006), and in the present context, we must accept that determination so long as it is supported by substantial evidence, *see, e.g.*, *Roadway Express, Inc. v. U.S. Dep't of Labor*, 495 F.3d 477, 483 (7th Cir. 2007) (citing *Brink's, Inc. v. Herman*, 148 F.3d 175, 178 (2d Cir. 1998)); 49 U.S.C. § 3105(d); 5 U.S.C. § 706(2)(E). In this case, the ALJ's findings as to Formella's tone, demeanor, and conduct in complaining about the truck's condition draw direct support from the testimony of Markus and Landowski, and indirect support from the

---

[2] (...continued)
replacement. Still, the ALJ determined that Formella had effectively refused to drive the truck when, in response to Landowski's report that Penske believed the mismatched tire treads posed no safety problem, Formella told Landowski that "[he] was wrong and Penske was wrong" and "[t]hat is illegal and I can't be driving a vehicle like that." Tr. 151. Construing Formella's remarks as a statutorily-protected refusal to drive the truck was a reasonable interpretation of the testimony, and Schnidt does not contend otherwise.

testimony of Osten and Miehle, who described their own encounters with Formella on the morning of his discharge in terms that were consistent with how Markus and Landowski characterized their own discussions with Formella. Formella, of course, denied any encounters with Miehle and Osten and described his interaction with Landowski and Markus in much more moderate terms. The conflict between his testimony and that of the other witnesses presented a classic credibility contest, the resolution of which belongs in all but the extraordinary case to the judge who heard and observed the witnesses first hand. *See*, *e.g.*, *Roadway Express*, 495 F.3d at 483.

What Formella does contend is that the ALJ and the Board erred in concluding that his behavior, even if it was as intemperate as Schnidt's witnesses described it, fell outside the latitude owed to an employee who is making a safety-related complaint. The right to engage in activity protected by the STAA "permits some leeway for impulsive employee behavior." *Combs v. Lambda Link*, ARB No. 96-066, 1997 WL 665483, at *3 (ARB Oct. 17, 1997); *see also Kenneway v. Matlack*, 1988-STA-020, 1989 DOL Sec. Labor LEXIS 47, at *7-*8 (Sec'y June 15, 1989). This principle derives from the broader labor context, where it has been recognized that a worker's statutory right to engage in concerted activity affords him some leeway to stray beyond the boundaries of workplace propriety in doing so without losing the protection of the statute. *See Dreis & Krump Mfg. Co. v. NLRB*, 544 F.2d 320, 329 (7th Cir. 1976) (quoting *NLRB v. Thor Power Tool Co.*, 351 F.2d 584, 587 (7th Cir. 1965)). However,

the employee's entitlement to some indulgence for the manner in which he engages in protected activity "must be balanced against the employer's right to maintain order and respect." *Id.* (quoting *Thor Power Tool*, 351 F.2d at 587); *see also Kenneway*, 1989 DOL Sec. Labor LEXIS 47, at *8 ("[a] key inquiry is whether [the] employee has upset the balance that must be maintained between protected activity and shop discipline . . . ."); *NLRB v. Caval Tool Div.*, 262 F.3d 184, 191-92 (2d Cir. 2001); *Mobil Exploration & Producing U.S., Inc. v. NLRB*, 200 F.3d 230, 243 (5th Cir. 1999); *YMCA of Pikes Peak Region, Inc. v. NLRB*, 914 F.2d 1442, 1446 (10th Cir. 1990); *Trustees of Boston Univ. v. NLRB*, 548 F.2d 391, 393 (1st Cir. 1977). Whereas modest improprieties will be overlooked, "flagrant," "indefensible," "abusive," or "egregious" misconduct will not be. *Thor Power Tool*, 351 F.2d at 587 ("flagrant"); *Roadmaster Corp. v. NLRB*, 874 F.2d 448, 452 (7th Cir. 1989) ("indefensible or abusive"); *Kenneway*, 1989 DOL Sec. Labor LEXIS 47, at *7-*8 ("indefensible"); *see also NLRB v. City Disposal Sys., Inc.*, 465 U.S. 822, 837, 104 S. Ct. 1505, 1514 (1984) ("abusive"); *Mobil Exploration*, 200 F.3d at 242-43 ("abusive" or "flagrantly insubordinate"); *Precision Window Mfg., Inc. v. NLRB*, 963 F.2d 1105, 1107-08 (8th Cir. 1992) ("indefensible" or "wanton"); *YMCA of Pikes Peak Region*, 914 F.2d at 1452 ("egregious"). Conduct that is disruptive or that amounts to blatant insubordination typically will fall into the category of unprotected behavior, as both the ALJ and the Board recognized. *See Kahn v. Sec'y of Labor*, 64 F.3d 271, 279 (7th Cir. 1995) (insubordination); *Harrison v. Admin. Review Bd. of U.S. Dep't of Labor, supra,*

390 F.3d at 759 (insubordinate and disruptive activity); *see also Culver v. Gorman & Co.*, 416 F.3d 540, 548 (7th Cir. 2005) (insubordination); *Vukadinovich v. Bd. of Sch. Trustees of N. Newton Sch. Corp.*, 278 F.3d 693, 700 (7th Cir. 2002) (insubordination); *Bob Evans Farms, Inc. v. NLRB*, 163 F.3d 1012, 1024 (7th Cir. 1998) ("unduly and dispropor- tionately disruptive or intemperate").

Because one cannot easily demarcate the extent of the leeway to be granted an employee engaging in pro- tected activity, each case must be evaluated on its own facts with careful attention to the competing interests of the employee and the employer. For example, although a number of courts (including this one) have said that the right to oppose unlawful practices in the workplace does not grant a worker the right to engage in insub- ordination, *e.g.*, *Kahn*, 64 F.3d at 279, the STAA, by granting a worker the right to refuse to operate a motor vehicle that he reasonably believes to be unsafe, ex- pressly grants the worker to engage in conduct that could otherwise be viewed as insubordinate. *See Kenneway*, 1989 DOL Sec. Labor LEXIS 47, at *7-*8 (citing *NLRB v. Florida Med. Ctr.*, 576 F.2d 666, 672 (5th Cir. 1978)). At the same time, where a driver believes that the condition of his assigned vehicle jeopardizes his own safety and that of the public, it is foreseeable that he may lose his composure in voicing that concern to his employer. As the Tenth Circuit has observed in another context, "It would be ironic, if not absurd, to hold that one loses the protection of an antidiscrimina- tion statute if one gets visibly (or audibly) upset about discriminatory conduct." *Hertz v. Luzenac Am., Inc.*, 370

F.3d 1014, 1022 (10th Cir. 2004). Moreover, as Formella rightly points out, an employer's own inaction or indifference in response to the safety concerns a driver has raised may understandably contribute to the driver's upset. "An employer cannot provoke an employee to the point where [he] commits such an indiscretion as is shown here and then rely on this to terminate [his] employment." *Trustees of Boston Univ.*, 548 F.2d at 393 (quoting *NLRB v. M & B Headware Co.*, 349 F.2d 170, 174 (4th Cir. 1965)); *see also Precision Window Mfg.*, 963 F.2d at 1108. In short, judges must take care in balancing the right of an employee to voice his safety concerns against the employer's right to an orderly workplace, lest the protection of the statute be denied to all but the most self-restrained and obsequious employee.

This case is difficult in the sense that what caused Schnidt to fire Formella was primarily his disrespectful and disruptive tone and demeanor in expressing the safety-related concerns about his truck rather than some overt action that could be so characterized, or even particular language that could be characterized as out of line. Although Markus and Landowski both testified that they felt somewhat threatened by Formella, he did not assault anyone, he did not threaten violence, he did not disobey an order, and he did not attempt to prevent anyone else from doing his or her job (the fact that he parked his truck in such a way as to block another driver, causing Osten to move it, appears to have been inadvertent). What he did do was lose his temper, speak more and more loudly until he was

shouting at his supervisors, question Landowski's ability and judgment, and repeatedly ask "Am I fired?" until Markus finally did fire him. Keeping in mind that, by all accounts, Formella was genuinely concerned about the mismatched tire treads on his truck, we may assume that reasonable people might disagree as to whether Formella's intemperate manner in expressing that concern was so out-of-line as to deprive him of the protection of the statute.

But the responsibility for deciding whether particular conduct falls within or without the leeway to which an employee is entitled belongs to the Board, whose judgment in this regard we must uphold so long as it is not arbitrary or illogical. *See Roadmaster Corp.*, 874 F.2d at 452; *Dreis & Krump Mfg.*, 544 F.2d at 329; *Thor Power Tool*, 351 F.2d at 587; *see also Int'l Union, UAW v. NLRB*, 514 F.3d 574, 581 (6th Cir. 2008); *NLRB v. Allied Aviation Fueling of Dallas LP*, 490 F.3d 374, 379 (5th Cir. 2007); *Earle Indus., Inc. v. NLRB*, 75 F.3d 400, 405 (8th Cir. 1996). The ALJ characterized Formella's behavior as both insubordinate and disruptive, and although the testimony may not compel that characterization, it nonetheless does support it. Formella emphasizes that the ALJ merely described his tone and demeanor as "boisterous," "loud," and "vehement," Formella Br. 24, but this does not do justice to the whole of the accounts that Markus and Landowski gave, or to the ALJ's finding that Formella was "provocative, intemperate, volatile, and antagonistic," ALJ Dec. 10. Markus testified that Formella became so loud and so vehement that he drew other employees toward her office at a run to see what was happening.

She used words like "volatile," "angry," and "unstable[ ]" to describe his deportment, Tr. 73, 74, 83, 127, 130, 135, 143, and although she agreed that he never made a threat, she did say that she felt threatened by his tone and demeanor, Tr. 73, 139. Landowski confirmed Markus's impressions, describing Formella as "almost hostile," "fired up," "in my face," and "red in the face." Tr. 150, 152. Their testimony lends adequate support to the ALJ's determination that Formella became disruptive and insubordinate in dealing with his superiors. *See Jennings v. Tinley Park Community Consol. Sch. Dist. No. 146*, 864 F.2d 1368, 1374-75 (7th Cir. 1988) (emphasizing the factual nature of such determinations). Moreover, the fact that Formella managed in quick succession to alienate and upset two of his fellow drivers in unrelated encounters on the same morning suggests that Markus and Landowski were not merely being overly sensitive to dissent in their reactions to Formella. Their testimony confirmed that Formella's tone and manner were not simply loud and forceful, but "in your face," intimidating, and antagonizing.

We cannot say that the Board was either arbitrary or illogical in agreeing with the ALJ that Formella's conduct exceeded the leeway to which he was entitled in refusing to drive the truck that Schnidt had assigned to him. Although some allowance must be made for impulsive and emotional behavior on the part of a driver with safety-related concerns, he can nonetheless be expected to demonstrate civility and respect for his superiors in voicing those concerns. The Board could reasonably conclude that in shouting so loudly that

other employees ran toward Markus's office to see what was the matter, for example, Formella exceeded any leeway to which he was entitled in pursuing his statutory rights.

### III.

The ALJ's factual determination that Schnidt fired Formella not because he refused to drive the truck assigned to him but because he was insubordinate and disruptive in expressing his safety concerns is supported by substantial evidence. Although Formella was entitled to some leeway for inappropriate behavior in voicing his concerns and refusing to drive his assigned vehicle, the Board was neither illogical nor arbitrary in sustaining the ALJ's determination that Formella exceeded that leeway in provoking and antagonizing his superiors. Formella's petition for review of the Board's adverse decision is therefore DENIED.