In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-2249

DIEGO GAINES,

*Plaintiff-Appellant,*

*v.*

K-FIVE CONSTRUCTION CORPORATION,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11-cv-03496 — **George W. Lindberg**, *Judge.*

ARGUED DECEMBER 5, 2012 — DECIDED JANUARY 3, 2014

Before MANION and SYKES, *Circuit Judges*, and DARROW,
*District Judge.*[*]

DARROW, *District Judge.* In the final days of his employment
at K-Five Construction, Diego Gaines questioned the road-
worthiness of two different trucks that he was assigned to
drive. Management took steps to address Gaines's concerns,

---

[*] Of the Central District of Illinois, sitting by designation.

but the trucks never reached the level of safety sought by Gaines. On his last Friday, he informally discussed an alleged steering problem with a K-Five mechanic. He later misreported what he was told. Gaines claims that he honestly believed he was accurately relaying the information obtained from the mechanic but that he botched the details. Citing the false report and various instances of alleged insubordination, K-Five fired Gaines.

Gaines argues that the events leading up to his termination prove that he was fired due to his national origin and/or because he complained about safety issues. He also claims that he is owed unpaid overtime. The district court entered summary judgment against Gaines on all counts. We find that Gaines has presented a triable issue of fact as to whether he was fired for complaining about safety issues. Accordingly, we remand for further proceedings consistent with this opinion.

## I. Background

Diego Gaines had been a seasonal semi-dump truck driver for K-Five Construction Corporation for roughly five years on May 4, 2010, the day he was fired. Gaines's duties at K-Five, a heavy highway paving contractor, primarily entailed hauling asphalt and other road building materials to and from job sites.

Throughout the 2007 to 2010 construction seasons, Gaines drove truck number 4275 most of the time. For several reasons, among them safety, K-Five made an effort to assign drivers to the same truck everyday. On Wednesday, April 28, 2010, however, K-Five supervisor Bob Schwarz assigned Gaines to truck number 4279. A simple visual inspection of the truck convinced Gaines that the truck was unsafe because he saw

that the tail pan was covered in asphalt. Not only did this violate a K-Five work rule that required drivers to keep their tail pans clean, but the pins were also not fully locking the gate due to the mess—Gaines worried that the unsecured gate could open during transit. After Gaines informed Schwarz of the problem, Schwarz personally attempted to scrape away the asphalt. Schwarz believed his efforts addressed the problem. Gaines did not. Although Schwarz largely removed the loosened asphalt, hardened asphalt remained. Gaines believed that the hardened asphalt could cause serious injury to persons or property if chunks of it broke up and fell off during transit.

Schwarz never mentioned that Gaines's refusal to drive truck number 4279 violated any work rule. Instead, Schwarz apprised another supervisor, Steve Radtke, of the situation and then simply reassigned Gaines to truck number 4289, another available truck. The newly-assigned truck had rolled over in the summer of 2006 but had since been sufficiently repaired such that it passed its State of Illinois safety inspection less than two months prior. Gaines took the wheel for the day, and was nearly involved in an accident when truck 4289 pulled hard to the left. He informed Schwarz and a truck maintenance supervisor of the incident.

On Thursday, the next day, Gaines was again assigned to truck 4289, although his normal truck—truck number 4275—was now available. Gaines complained to Radtke that truck 4289 had a bad seat, a door that did not close properly, a steering problem, and a faulty tarp. This time, management did not reassign Gaines to a new truck. Instead, Gaines drove

truck 4289 for the second day in a row.[1] At the end of his shift, Gaines recorded the alleged problems with truck 4289 in his Daily Driver's Report ("DDR").[2]

On Friday, Gaines was again assigned to truck 4289, although his normal truck was available. Gaines did not believe that the truck was roadworthy—even though at least one mechanic examined the truck the night before—because the problems that he had identified in his Thursday DDR remained unfixed. Gaines did not want a repeat of Wednesday's close call so he radioed Radtke to discuss the unsafe condition of the truck. Gaines requested that, at the very least, another driver take it for a test drive. Apparently annoyed, Radtke ordered Gaines to wash and wax the truck while another driver was located. Gaines initially refused but then started washing the truck. Whether Gaines refused to wax the truck or whether he ran out of time is disputed.

---

[1]  K-Five asserts that before Gaines went out for the day on Thursday, a K-Five mechanic repaired truck 4289's door so that it would close. This would suggest that at least some of Gaines's safety complaints were legitimate.

[2]  K-Five requires its drivers to log certain information in DDRs. The DDRs are submitted to the mechanics' shop and the main office. The top of the DDR includes boxes for drivers to report their "Time Start," "Time Start at Job," "Time Finish at Job," and "Time Parked." The main office reviews the top of the DDRs to record drivers' hours. The bottom of the DDR includes space for "any down time, delays, accidents, & etc" and "repair request[s]." Mechanics review the bottom of the DDRs to identify needed vehicle repairs and to spot issues related to vehicle safety.

In the meantime, Radtke found and asked another driver, Al Lukritz, to test drive truck 4289. Lukritz drove the truck and concluded that although it pulled to the left, it was road-worthy. After hearing about the test drive, and allegedly fearing termination if he refused, Gaines agreed to drive the truck for the third day in a row.

After his 13-hour shift, Gaines returned to the K-Five yard and spoke with mechanic Richard Johnston about truck 4289 pulling to the left. Johnston testified that he told Gaines that the steering wheel was off-center and that there were two possible causes: one, that someone might have taken the steering wheel off and reinstalled it a spline off; or two, that somebody might have changed the drag-link and screwed it farther in or out from the original setting. Thereafter, Gaines recorded in his evening DDR that "I spoke with [Johnston]. He confirmed that steering drag-link is off centered." That statement, however, is inaccurate. Johnston stated that the steering wheel was off-center, not that the drag-link was off-center. Gaines appears to concede that he may have misrepresented what Johnston told him but claims that he was reporting what he honestly but mistakenly believed Johnston to have said about the steering issues.

The following Monday, May 3, Johnston called Radtke to inform him that Gaines falsely attributed a statement to him (i.e., the "drag-link" comment in Gaines's Friday DDR). Also on Monday, Radtke met with K-Five Vice President Robert Krug to discuss the recent events involving Gaines. They agreed to issue Gaines a warning slip for falsifying information in his Friday DDR. According to K-Five's Drivers Manual, a consequence of falsifying information in a DDR can include

discharge. Gaines knew, or at least was on notice of, this rule because he previously affirmed in writing that he agreed to abide by all of the rules contained in the 2010 Drivers Manual.

Johnston later presented Radtke with a written statement describing what had transpired between him and Gaines on Friday related to truck 4289's alleged steering problems. After reviewing the statement, Radtke requested that Johnston prepare a condensed version. The condensed version left out the part where Johnston told Gaines that the steering wheel could be off because somebody might have changed the drag-link. Gaines suggests that Radtke wanted that information out of the official report because confusing "the steering wheel could be off centered because of the drag-link" with "the drag-link could be off centered" is understandable.

Krug and Radtke did not just issue Gaines a warning slip for falsifying his Friday DDR. Although neither Schwarz nor Gaines was interviewed or otherwise consulted about the decision, Krug and Radtke concluded that Gaines's refusal to drive truck 4279 (the truck with the hardened asphalt) was unreasonable and consequently issued Gaines a second warning slip. Krug and Radtke further agreed to issue Gaines a third warning slip for refusing to wax truck 4289. Finally, they agreed to issue Gaines a fourth warning slip for delaying his work start time on Friday by refusing to drive truck 4289 until after Lukritz completed his test drive. In total and all at once, Gaines was written up for falsifying his DDR—itself a terminable offense—and for three instances of alleged insubordination. K-Five's Drivers Manual states that after two warnings, the third offense may result in discharge.

On May 4, Radtke called Gaines to tell him not to come to work because he was fired. When Gaines asked why, Radtke informed him that he would get everything in the mail. K-Five then simultaneously mailed Gaines the four warning slips and a discharge slip.

Gaines sued K-Five under Title VII for national origin discrimination and retaliation. He further asserts retaliation in violation of the Surface Transportation Assistance Act ("STAA") and a related claim under Illinois common law retaliatory discharge. Finally, he claims K-Five failed to pay him regular and/or overtime wages in violation of the Fair Labor Standards Act ("FLSA").

## II. Discussion

We review *de novo* a district court's grant of summary judgment, viewing the evidence in the light most favorable to the nonmoving party. *Healy v. City of Chicago*, 450 F.3d 732, 738 (7th Cir. 2006). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### A. Title VII Discrimination and Retaliation

Gaines alleges that his termination was discriminatory and retaliatory. As to the former, Gaines alleges that K-Five fired him because of his national origin, Mexican. As to the latter,

Gaines alleges that K-Five fired him in retaliation for filing an EEOC charge against the company in January 2010.[3]

Gaines may establish his Title VII discrimination claim and his Title VII retaliation claim by either the direct or indirect method of proof. *Coleman v. Donahoe*, 667 F.3d 835, 859 (7th Cir. 2012). K-Five argues that Gaines waived any argument that his Title VII claims raise a genuine issue of material fact under the direct method, and we agree. Because he neglected to make that argument at the district court level, Gaines cannot now argue that his Title VII claims should survive summary judgment under the direct method of proof. *Karazanos v. Madison Two Assocs.*,147 F.3d 624, 629 (7th Cir. 1998) ("Arguments not made to the district court are waived on appeal, as we have said on countless occasions."). Gaines does not claim that he made a direct method argument to the district court or even that he cited direct method cases; rather, he only counters that he presented classes of circumstantial evidence that could support a direct method argument.[4] This is not enough. *See Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 608 (7th Cir. 2012) ("[T]he waiver doctrine charges litigants with raising the arguments they present on appeal in the district court, not just the facts on which their appellate arguments will rely."); *Weber*

---

[3] In his brief, Gaines asserts that he filed an EEOC charge against K-Five in January 2010. But Gaines does not cite to any support in the record for such an assertion nor does he expound on the basis for his EEOC charge. Because we do not need to know the details of Gaines's EEOC charge to affirm the district court, we will not search the record to uncover such details.

[4] Gaines's counsel conceded at oral argument that he did not indicate to the district court that he intended to argue under the direct method.

*v. Univs. Research Ass'n, Inc.*, 621 F.3d 589, 592–93 (7th Cir. 2010) (finding direct method waived where the plaintiff mentioned suspicious timing, a class of circumstantial evidence that could support a direct method argument, but did nothing else to indicate to the district court that plaintiff intended to pursue an argument under the direct method of proof); *Timm v. Ill. Dep't of Corr.*, 335 F. App'x 637, 642 (7th Cir. 2009) (finding direct method waived because plaintiff failed to raise the direct method argument, even though circumstantial evidence supporting a direct method theory was presented at district court).

Having found Gaines's arguments under the direct method waived, we now turn to Gaines's arguments under the indirect method of proof. Normally, discrimination and retaliation claims are analyzed separately. But in this case both claims fail for the same reason: Gaines has not identified a similarly situated employee—known as a "comparator." Gaines's Title VII discrimination and retaliation claims each require him to identify a comparator when proceeding under the indirect method of proof. *See Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 545 (7th Cir. 2002) (discrimination elements); *Harper v. C.R. England, Inc.*, 687 F.3d 297, 309 (7th Cir. 2012) (retaliation elements).

Similarly situated employees need not be identical to the plaintiff, but they do have to be "directly comparable to the plaintiff in all material respects." *Coleman*, 667 F.3d at 846 (internal citations omitted). Though he only needs one comparator, Gaines offers three potential comparators: Craig Konieczka, Darnell Thomas, and Al Lukritz. We will address each of these K-Five truck drivers in turn.

First, Craig Konieczka is argued to be a similarly situated employee because in June 2010, he wrote down his start time as 7:15 a.m. whereas his scheduled start time was 7:20 a.m. Gaines claims that this shows Konieczka falsified his DDR in such a way that resulted in him "stealing time" from the company. According to Konieczka, Steve Radtke found out about the discrepancy and orally warned Konieczka that falsifying information in a DDR was a terminable offense. But nothing more came of it.

Setting aside Gaines's alleged instances of insubordination, which if considered would distinguish Gaines from Konieczka in a material respect, one instance of a five-minute discrepancy in start time is not comparable to misattributing a statement about truck maintenance to a K-Five mechanic. Even if Gaines offered evidence suggesting that Konieczka did not in fact start work at 7:15 a.m.—which Gaines did not do—K-Five's payroll system is based on quarter hour increments, which means the extra five minutes were unlikely to result in any overpayment. So although both Konieczka and Gaines could be seen as technically falsifying information on a DDR, Konieczka's alleged falsification likely had no consequences. Conversely, Gaines's alleged falsification could have affected other K-Five employees or operations. For example, had the misstatement not been caught by Johnston, another mechanic could have seen it and either conducted an improper repair on the truck, ordered an unnecessary replacement part, or realized the error and unfairly concluded that Johnston was incompetent. Without more, Konieczka's alleged five minute discrepancy is so trivial that his conduct is not of comparable seriousness to Gaines's, so Gaines cannot take Konieczka to a jury as a

comparator. *See Johnson v. Artim Transp. Sys., Inc.*, 826 F.2d 538, 543–44 (7th Cir. 1987) (violation of the same work rule may not be sufficient to establish a prima facie case if the underlying conduct is greatly dissimilar).

Next, Gaines offers Darnell Thomas. Thomas was also terminated by K-Five but not until his fifth infraction of company rules within a twelve month period. A review of the record shows that Radtke or Krug issued four of the five warnings and that all five warnings were for violations of company rules that Gaines is not alleged to have violated. Though the record shows that Thomas violated work rule 26 (showing up late to work) four times and rule 25 (discourtesy towards a K-Five employee, supplier, customer and/or general public) once, Gaines does not offer any evidence that describes the details of Thomas's infractions, so we are not in a position to analyze whether Thomas's infractions were of comparable seriousness. *See Coleman*, 667 F.3d at 850 ("In a disparate discipline case, the similarly-situated inquiry often hinges on whether co-workers engaged in comparable rule or policy violations and received more lenient discipline."(internal quotations omitted)). The similarly-situated analysis requires more than simply counting the number of warning slips another employee received before also being terminated, especially when the numbers are so close (four for Gaines versus five for Thomas). And even setting aside Gaines's warnings for insubordination, falsifying a DDR is itself a terminable offense, unlike the work rules Thomas is alleged to have violated. As far as we know, Thomas just showed up a few minutes late to work. Because Thomas engaged in differ-

ent conduct, of which we have no details, he cannot serve as a comparator.

Finally, Gaines argues that Al Lukritz is similarly situated because Gaines remembers Lukritz's test drive of truck 4289 to have started at 7:20 a.m., but Lukritz recorded that it started at 7:00 a.m. in his DDR. Even assuming that Lukritz did in fact record an extra 20 minutes, and again setting aside Gaines's alleged instances of insubordination, Gaines offers no evidence that any K-Five supervisor was ever told or otherwise aware of the incorrect start time on Lukritz's DDR. Without that evidence, Gaines cannot defeat summary judgment. *See Friedel v. Madison*, 832 F.2d 965, 974–75 (7th Cir. 1987) (explaining that defendant is entitled to summary judgment even though plaintiff offers evidence that comparators engaged in same conduct because no evidence shows that defendant knew about comparators' behavior). Because Gaines has not identified a suitable comparator, his indirect theory claims were properly defeated at summary judgment.

## B. STAA Retaliation

In the early 1980s, random inspections by law officers around the country revealed widespread violations of commercial motor vehicle safety regulations. *See Bettner v. Admin. Review Bd.*, 539 F.3d 613, 615 (7th Cir. 2008) (citing *Brock v. Roadway Express, Inc.*, 481 U.S. 252, 258, 262 (1987)). In response to this grim revelation, Congress enacted certain protections in section 405 of the Surface Transportation Assistance Act ("STAA"). *See id*. at 615–16. The premise of Congress's action was that employees (e.g., truck drivers) are in the best position to identify safety violations. *Id*. at 615. Congress wanted to

encourage employees to complain about safety violations when they see them. *Id*. Section 405 of the STAA therefore identifies categories of protected activity, like complaining about safety issues, and makes it illegal for employers to retaliate against their employees for engaging in such protected activity. *See* 49 U.S.C. § 31105.

Invoking the STAA, Gaines filed a complaint with the Occupational Safety and Health Administration ("OSHA") in June 2010. No final decision issued within 210 days, allowing Gaines to file his complaint with the district court for *de novo* review. *See* 49 U.S.C. § 31105(c). At the district court, Gaines attempted to present a prima facie case by demonstrating that his STAA protected activity was a contributing factor in K-Five's decision to subject him to an adverse employment action. *See Formella v. U.S. Dep't of Labor*, 628 F.3d 381, 389 (7th Cir. 2010). Both parties agreed that termination is an adverse employment action. Thus, the issue turned on whether Gaines engaged in an STAA protected activity, and if so, whether that activity was a contributing factor in his termination. If Gaines put forth a prima facie case, then the burden would shift to K-Five to demonstrate by clear and convincing evidence that it would have fired Gaines even if he did not engage in STAA protected activity. *Id*. Should K-Five make such a showing, then Gaines has the opportunity to show that K-Five's alternate reason for firing Gaines is pretextual. *See Roadway Express, Inc. v. U.S. Dep't of Labor*, 495 F.3d 477, 482 (7th Cir. 2007).

The district court held that Gaines's initial refusals and actual delays in driving truck 4289 were not protected activities because they were not based on an objectively reasonable belief that the truck was unsafe. As a result of finding that Gaines did

not engage in STAA protected activity, the district court granted summary judgment in favor of K-Five. Again, we review *de novo* the district court's grant of summary judgment, viewing the evidence in the light most favorable to Gaines. *Healy*, 450 F.3d at 738.

Though the district court only addressed whether Gaines's complaints about truck 4289 constitute protected activity, Gaines argued then and argues now on appeal that he engaged in three separate protected activities: (1) refusing to drive truck 4279 (the truck with asphalt) because it was unsafe, (2) initially refusing to drive truck 4289 until after Lukritz's test drive because the truck was unsafe, and (3) filing a DDR that raised a safety concern with truck 4289 (even though he incorrectly reported Johnston's statement). Gaines claims that each of these actions, and all of them combined, were a contributing factor in K-Five's decision to fire him. We find that each of the three identified events raises a triable issue of fact under the STAA.

### 1. Refusing to Drive Truck 4279

Under the STAA, an employee engages in protected activity when he refuses to operate a vehicle because he fears that operating the vehicle will cause harm to him or the public:

> A person may not discharge an employee … because the employee refuses to operate a vehicle because the employee has a reasonable apprehension of serious injury to the employee or the public because of the vehicle's hazardous safety or security condition.

49 U.S.C. § 31105(a)(1)(B)(ii). Whether the employee's appre-
hension was indeed reasonable is analyzed from the viewpoint
of a reasonable individual:

> [A]n employee's apprehension of serious injury is
> reasonable only if a reasonable individual in the
> circumstances then confronting the employee would
> conclude that the hazardous safety or security
> condition establishes a real danger of accident,
> injury, or serious impairment to health. To qualify
> for protection, the employee must have sought from
> the employer, and been unable to obtain, correction
> of the hazardous safety or security condition.

49 U.S.C. § 31105(a)(2). As the statute indicates, an employee
is only protected for refusing to drive a vehicle if he first asked
his employer to correct the hazardous safety condition, but the
safety hazard remained uncured. *Id*.

Once Gaines determined that truck number 4279 was
unsafe because the tail pan was covered in asphalt, he alerted
his supervisor, Schwarz, to the hazardous condition. And even
though Schwarz scraped off loose asphalt, Gaines refused to
drive the truck because he believed that the hazardous
condition had not been fully corrected. The issue is whether
Gaines's fear of injury after Schwarz scraped off the loose
asphalt was objectively reasonable.

A K-Five work rule requires its drivers to keep their tail
pans clean. Schwarz testified that the work rule is important
because "if you have a lot of asphalt on your spread pan … it's
not safe." The parties agree that some asphalt remained on
truck 4279's tail pan despite Schwarz's scraping. Whether the

amount of remaining asphalt could still reasonably be deemed unsafe is a question for the jury. Even if—as K-Five argues despite the broad language of its work rule—it is only loose asphalt that is problematic, a reasonable person could conclude that Schwarz's violent scraping may have loosened the underlying hardened asphalt that his efforts had not removed. Accordingly, whether Gaines could reasonably believe that the remaining asphalt posed a safety risk is a genuine issue of material fact. *See Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598–99 (7th Cir. 2000) (noting that facts are material if they "might affect the outcome of the suit" and an issue is genuine "if a reasonable trier of fact could find in favor of the nonmoving party") (citations omitted).

Because we hold that Gaines has presented a genuine issue of material fact regarding whether his refusal to drive truck 4279 was an STAA protected activity under 49 U.S.C. § 31105(a)(1)(B)(ii), we now consider whether Gaines's refusal was a contributing factor in K-Five's termination decision. K-Five argues it was not, but that argument is difficult to reconcile with K-Five issuing Gaines a warning for refusing to drive truck 4279 and then mailing that warning to Gaines when K-Five fired him. This alone strongly suggests that Gaines's refusal to drive truck 4279 played a role in K-Five's decision to fire Gaines. But there is more: K-Five's own interrogatory response states that Gaines was terminated based on his work performance and "repeated" failure to follow company rules. Gaines has therefore shown that his refusal to drive truck 4279 contributed to K-Five's decision to fire him.

K-Five argues that because it could have fired Gaines based on the false DDR alone, his refusal to drive truck 4279 could

not have been a contributing factor in his termination. As an initial matter, K-Five appears to misunderstand the legal framework. All Gaines has to show to make out his prima facie case is that his refusal to drive truck 4279 contributed to K-Five's decision to fire him, which he has done. *See Formella*, 628 F.3d at 389. After Gaines makes out his prima facie case, the burden shifts to K-Five to prove by clear and convincing evidence that it would have fired Gaines even if he did not engage in this STAA protected activity (i.e., refusing to drive truck 4279). This is where K-Five's argument is properly made. But K-Five has not met its burden. Though K-Five's Drivers Manual states that submitting a false DDR is by itself a terminable offense, K-Five admitted at oral argument that no direct evidence shows that K-Five would have actually terminated Gaines based solely on the false DDR.

### 2. Initial Refusal to Drive Truck 4289

Gaines argues that his initial refusal to drive truck 4289 on Friday, April 30, was a protected activity under the STAA. He seeks protection under the same provision as above, 49 U.S.C. § 31105(a)(1)(B)(ii). Accordingly, Gaines must show that he had a reasonable apprehension of serious injury because of the vehicle's hazardous safety condition. *See id*. K-Five argues, and the district court agreed, that considering all of the circumstances—as is required under § 31105(a)(2)—no reasonable person could have concluded that truck 4289 posed a real danger of accident or injury.

The district court first noted that Gaines did not report any safety problems with truck 4289 in his Wednesday DDR. While true, evidence also shows that Gaines radioed Greg

Kolloff—the shop foreman—on Wednesday to report both the problems with the truck and the near miss. In addition, Gaines testified that he reported the near miss to Bob Schwarz in the drivers' room that same day. K-Five offers no evidence to rebut these two oral reports. We cannot infer that Gaines's failure to record the truck's safety problems in his Wednesday DDR implied that Gaines did not have a reasonable apprehension of serious injury, especially in light of evidence of Gaines's oral reports. *See Coleman*, 667 F.3d at 842 ("In assessing whether the [defendant] is entitled to summary judgment, we examine the record in the light most favorable to [the plaintiff], the non-moving party, resolving all evidentiary conflicts in [his] favor and according [him] the benefit of all reasonable inferences that may be drawn from the record.").

Next, the district court discussed Gaines's decision to drive truck 4289 on Thursday before recording multiple problems with the truck in his Thursday DDR as evidence that the truck was safe. We do not agree that driving a truck and then reporting safety concerns is somehow evidence that the truck had no safety concerns. Moreover, even if we could draw such a conclusion from Gaines's decision to drive the truck on Thursday, evidence shows that Gaines did in fact complain about the condition of the truck on Thursday morning.

At this point, the evidence leading up to Friday morning supports Gaines, not K-Five. Gaines claims that truck 4289 nearly caused an accident when it pulled hard to the left on Wednesday. Shortly thereafter, Gaines orally reported the near miss to two K-Five supervisors. On Thursday morning, Gaines again complained about steering problems with the truck. That night, he recorded the alleged steering problem in his DDR.

Construing all facts in the light most favorable to Gaines, a reasonable person would still have lingering concerns about the condition of truck 4289 on Friday morning.

K-Five's best evidence is that on Friday morning Gaines was told that K-Five mechanics inspected truck 4289 on Thursday night. But while this evidence helps K-Five, it is not sufficient to erase a genuine dispute of material fact. A jury could find that a reasonable person would still conclude that truck 4289 posed a real safety risk on Friday morning for at least three reasons. One, the mechanics inspected the truck but there is no evidence that the mechanics made any repairs. Believing that Gaines had steering problems the previous two days, as we must because Gaines is the nonmoving party, Gaines could have been understandably leery of driving the unrepaired truck. Two, Gaines's Friday morning concerns with the steering were later confirmed by Lukritz, who concluded that the truck pulled to the left. While Lukritz ultimately concluded that the truck was roadworthy, he did confirm the underlying steering problem. Three, Gaines's experiences were also later confirmed by Johnston, who concluded that the steering wheel was off center. K-Five's brief asserts that an off-center steering wheel is a "harmless condition," but K-Five offers no evidence to support such an assertion. Even if the truck could drive straight with an off-center steering wheel, it is not unreasonable to conclude that asking Gaines to work a 13-hour shift with a misaligned steering wheel posed a safety concern. Johnston's inspection bolsters the reasonableness of Gaines's concerns that the truck's *unfixed* steering remained a safety hazard in light of his recent experiences with the truck.

In sum, the evidence leading up to Friday morning supports Gaines's reasonable apprehension with truck 4289. Gaines alleges that he complained about steering problems with truck 4289 on Wednesday and Thursday. On Wednesday he claims that the steering problems almost caused an accident on the highway. Gaines's testimony is bolstered by Lukritz and Johnston, who both confirmed a problem with the steering (although they disagree about the seriousness of the problem). In that context, a jury could conclude that a reasonable person would believe that truck 4289 posed a real safety concern even though the mechanics reported no problem with the steering. We therefore conclude that Gaines has presented a genuine issue of material fact as to whether his initial refusal to drive truck 4289 was protected activity under the STAA.

K-Five issued a warning to Gaines for this refusal and mailed it to him with discharge papers. To establish a violation of § 31105(a), Gaines must present evidence this warning contributed to K-Five's termination decision. Because the warning accompanied discharge papers, and K-Five's own interrogatory response suggests that Gaines's alleged insubordination played a role in its decision to fire him, Gaines has shown that his initial refusal to drive truck 4289 contributed to K-Five's decision to fire him. K-Five has not presented sufficient evidence for the court to conclude that it would have fired Gaines absent his initial refusal to drive truck 4289.

### 3. The Inaccurate DDR

Under the STAA, an employee also engages in protected activity if he files a complaint related to a safety violation:

> A person may not discharge an employee …
> because the employee … has filed a complaint
> or begun a proceeding related to a violation of a
> commercial motor vehicle safety or security
> regulation, standard, or order, or has testified or
> will testify in such a proceeding.

49 U.S.C. § 31105(a)(1)(A)(i). Gaines argues that filing his Friday DDR (the one with the misstatement) was itself protected activity. K-Five basically concedes that Gaines's DDR was a contributing factor in his termination. Accordingly, if Gaines can show that filing his Friday DDR was an STAA protected activity, he has made out his prima facie case. *See Formella*, 628 F.3d at 389. And although K-Five's Drivers Manual says K-Five could have terminated Gaines based solely on his three alleged instances of insubordination, K-Five offers no evidence that it would have actually fired Gaines if he had not submitted the inaccurate DDR. Thus, if Gaines can show that filing his Friday DDR was an STAA protected activity, we must reverse the district court on this issue.

K-Five's only argument is that false statements are not protected by the STAA. Because K-Five did not challenge whether Gaines's Friday DDR would constitute a "complaint … related to a violation of a commercial motor vehicle safety or security regulation, standard, or order," had it been factually accurate, that issue is not before us. The narrow issue presented to us on appeal is whether filing a complaint that would otherwise constitute STAA protected activity loses such protection if the complaint is based on inaccurate information.

To answer this question, both parties turn to *Roadway Express, Inc., v. U.S. Dep't of Labor*, 495 F.3d 477 (7th Cir. 2007), but as we shall see, that case is inapposite. In *Roadway*, a truck driver, Jon Gomaz, allegedly falsified the number of hours worked in his driving log and was discharged for it. His coworker, Peter Cefalu, provided a written statement at Gomaz's grievance hearing asserting that a Roadway supervisor had once asked Cefalu to falsify his driving log. Cefalu was fired and thereafter brought suit alleging his discharge violated the STAA's prohibition on retaliation. In reaching its decision, the Court concluded that driving logs were a measure of safety compliance and driving-log rules (including keeping accurate time records) were safety regulations. Therefore, testimony exposing a supervisor's direction to cover up a safety regulation violation was protected under 49 U.S.C. § 31105(a)(1)(A)(i).

*Roadway* does not shed light on how this Court would view an inaccurate "complaint … related to a violation of a commercial motor vehicle safety or security regulation, standard, or order" and having found no other STAA case in our Circuit that answers this question, we turn to Title VII retaliation jurisprudence for guidance. In that context, an employee can engage in statutorily protected activity by complaining about discrimination even if the challenged conduct does not actually constitute discrimination. *See, e.g., Rucker v. Higher Educ. Aids Bd.*, 669 F.2d 1179, 1182 (7th Cir. 1982) (a plaintiff need not prove the underlying discrimination case to have an actionable retaliation case). An employer is prohibited from retaliating against its employee for taking action if the employee had a good faith and reasonable belief that he was opposing an

unlawful practice. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 631 (7th Cir. 2011). Gaines draws the analogy that filing his inaccurate DDR should constitute a protected activity as long as he had a reasonable and good faith belief that he was complaining about a safety violation.

Before biting off on this analogy, we first note that the line of Title VII cases that Gaines relies on are cases in which the plaintiff's complaints are factually true but legally insufficient. *See, e.g., Hamner v. St. Vincent Hosp. & Health Care Ctr.*, 224 F.3d 701, 706–07 (7th Cir. 2000); *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994); *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1314–16 (7th Cir. 1989). For example, the plaintiff in *Holland* complained about factually true instances of sexually offensive remarks but such conduct was not sufficiently severe to violate Title VII. *See Holland*, 883 F.2d at 1314–16. The Court held that the plaintiff's complaints about the sexually offensive remarks were nonetheless Title VII protected activity—the employer could not retaliate against the plaintiff for making such complaints. *Id*. In this case, Gaines's complaint was somewhat the opposite: legally sufficient but factually untrue. Nonetheless, the text of and policy behind the STAA support Gaines's position that filing his Friday DDR was protected activity if he reasonably and in good faith believed that he was accurately identifying a safety regulation, standard, or order violation.

First, the text of the STAA protects employees complaining of safety violations—Gaines was complaining about a steering problem he considered unsafe. There is no evidence that Gaines intentionally misidentified the problem. Thus, the Friday DDR satisfies the plain language of the statute: Gaines

filed a complaint (the DDR) related to a safety violation (faulty steering). *See* 49 U.S.C. § 31105(a)(1)(A)(i) (prohibiting the discharge of an employee because he or she "has filed a complaint or begun a proceeding related to a commercial motor vehicle safety or security regulation, standard, or order").

Second, Congress passed the STAA to encourage truck drivers and other industry employees who see safety problems to report them. *See Bettner*, 539 F.3d at 615 (citing 128 Cong. Rec. 32,509–10 (1982) (remarks of Sen. Danforth and summary of proposed statute)). Refusing to extend protection to employees who report safety problems just because the details of the violation turned out to be inaccurate would undercut Congress's goals for this legislation. This is especially true because not everyone who can detect a safety concern can accurately diagnose or characterize its source. Employees aware of safety violations should not fear that an employer who uncovers an unintentionally inaccurate detail will use it as cover to fire the complaining employee.

Our sister circuits and the Administrative Review Board have reached similar conclusions. *See Koch Foods, Inc. v. Sec'y, U.S. Dep't of Labor*, 712 F.3d 476, 482–83 (11th Cir. 2013) (recognizing that a complaint is protected under § 31105(a)(1)(A)(i) if it was based on a reasonable belief or perception that a company was engaged in a violation of a motor vehicle safety regulation); *Calhoun v. U.S. Dep't of Labor*, 576 F.3d 201, 212 (4th Cir. 2009) ("To qualify for protection, a complaint must be based on a 'reasonable belief that the company was engaging in a violation of a motor vehicle safety regulation[.]'"); *Yellow Freight Sys., Inc. v. Martin*, 954 F.2d 353,

357 (6th Cir. 1992) (holding that former version of statute protected employees who complain about "possible safety violations"); *Guay v. Burford's Tree Surgeon's Inc.*, ARB Case No. 06-131, 2008 WL 2624771, at *4 (June 30, 2008) (finding an employee is protected under the complaint clause of the STAA if he acted on a reasonable belief regarding the existence of a safety violation).

We hold that an employee who files a reasonable safety complaint in good faith is protected by 49 U.S.C. § 31105(a)(1)(A)(i) even when that complaint contains inaccurate information. In this case, Gaines must therefore demonstrate that he had a reasonable and good faith belief that he was accurately reporting a safety violation when he filed his Friday DDR. We find that Gaines has presented a genuine dispute of material fact on this issue, so K-Five was not entitled to summary judgment on this issue.

### C. Illinois Common Law Retaliation

To prevail on his Illinois common law retaliation cause of action, Gaines must establish (1) that K-Five fired Gaines, (2) in retaliation for Gaines's activities, and (3) the discharge violated a "clear mandate of public policy." *Turner v. Mem'l Med. Ctr.*, 911 N.E.2d 369, 374 (Ill. App. Ct. 2009). The parties disagree about why the district court granted summary judgment in favor of K-Five. Since our review is *de novo*, we will not wade into that disagreement.[5]

---

[5] K-Five makes a half-hearted argument that Gaines waived his common law retaliation claim because he misinterpreted the district court's opinion.

(continued...)

Because K-Five fired Gaines, the only issues on appeal are whether K-Five fired Gaines in retaliation for something Gaines did and whether K-Five violated public policy by firing Gaines. The first issue is easily resolved in Gaines's favor. Though K-Five argues that it had multiple bases to fire Gaines, each ground for his termination is based on something Gaines did: his alleged insubordinate acts and his filing a false DDR. Accordingly, the only issue left is whether Gaines's termination violated a "clear mandate of public policy."

K-Five is not entitled to summary judgment on this issue for the same reasons that it is not entitled to summary judgment on Gaines's STAA claim. If K-Five fired Gaines because he complained about safety issues, then his termination violates a "clear mandate of public policy." *See Brock v. Roadway Express, Inc.*, 481 U.S. 252, 258 (1987) (stating that by enacting the STAA, Congress declared policy to "encourage employee reporting of noncompliance with safety regulations"); *Wheeler v. Caterpillar Tractor Co.*, 485 N.E.2d 372, 377 (Ill. 1985) (finding that Congress can declare policy by enacting legislation).

### D. FLSA Claim for Unpaid Overtime

Finally, Gaines argues that the district court erred by granting summary judgment against his FLSA claim for unpaid overtime because the evidence shows that K-Five knew Gaines was working overtime without prior approval yet

---

[5] (...continued)

To the extent K-Five is inviting us to find waiver, we decline K-Five's invitation because Gaines has properly raised the issue on appeal.

declined to pay him for it. Specifically, Gaines seeks reimbursement for days on which he allegedly came in 15 minutes early to inspect his truck. K-Five does not challenge Gaines's claim that he came in early on certain days, though it questions why Gaines would do that because K-Five builds "pre-trip" inspection time into the drivers' shifts. Instead, K-Five says it simply does not know, nor did it ever know, whether Gaines was working an extra 15 minutes. While an employer cannot slyly sit back in order to reap extra work without pay, it has no obligation to pay for work it did not know about and had no reason to know about. *Kellar v. Summit Seating, Inc.*, 664 F.3d 169, 177 (7th Cir. 2011). Accordingly, the only issue for review is whether Gaines has presented a genuine issue of material fact as to whether K-Five knew that Gaines worked an extra 15 minutes on certain days.

Gaines offers three sources of evidence to support his claim. First, Gaines points to his DDRs. The top of all DDRs contain four bold, prominent boxes: "Time Start," "Time Start at Job," "Time Finish at Job," and "Time Parked." In those boxes, Gaines recorded his time. But at the bottom of some of his DDRs, Gaines wrote "pre-trip" followed by a time that was 15 minutes before the time recorded in the "Time Start" box. Gaines argues that his "pre-trip" notation at the bottom of the DDR gave K-Five actual notice that he was working an additional 15 minutes before his start time. In response, K-Five offers the unrebutted testimony of Rainelle Burke, who testified that it was her practice to only review the top portions of DDRs for payroll purposes.

Second, Gaines points to Schwarz's testimony that Gaines "was always [at work] 15, 20 [minutes], half an hour early."

Gaines argues that because a K-Five supervisor knew he was at work early, a jury could find that the supervisor knew Gaines was working overtime that was not previously authorized. K-Five responds that no evidence shows that Schwarz knew when Gaines actually started working or knew that Gaines was not being compensated for his unauthorized overtime.

Third, Gaines points to his own testimony that for four to five months in 2009, Radtke and/or Schwarz would wait by Gaines's truck before his start time. Because they were hanging around Gaines's truck in the morning, Gaines argues that a jury could infer that they knew he was working unauthorized overtime. K-Five responds that again, even if Radtke and Schwarz saw Gaines come to work early no evidence indicates that either of them ever saw Gaines actually working before his scheduled start time or even knew Gaines's precise start time.

We find that Gaines's evidence does not raise a genuine issue of material fact. Gaines offers no evidence that anybody at K-Five saw him working before his scheduled start time, much less that any such observer knew what time Gaines was scheduled to start work. And we cannot make a reasonable inference that anybody knew based on the simple fact that K-Five supervisors may have seen Gaines come to work early. In *Kellar*, the Court held that simple knowledge that the plaintiff came to work early was not enough to conclude that the employer knew or should have known that the plaintiff started working early because it was typical at the business for employees to socialize before starting work. *Kellar*, 664 F.3d at 177–78. Therefore, the plaintiff's arriving at work early "raised no flags." *Id*. at 178. In this case, Gaines presents no evidence

that his arriving at work early should have raised a flag that he was working unauthorized overtime. K-Five builds pre-trip inspection time into each driver's shift and Gaines offers no evidence that it is inadequate. Without a legitimate reason to start his pre-trip inspections early, we cannot reasonably infer K-Five should have known Gaines started them early.

Gaines's notations at the bottom of some of his DDRs also do not create a genuine issue of material fact. To begin with, the notation "pre-trip 7:00" is ambiguous. But more importantly, the DDR forms very clearly and prominently place the hours worked information at the top of the page. In light of the layout of the forms and Burke's testimony that reviewing DDRs for payroll purposes only requires reviewing the top of the form, we find that Gaines's notations at the bottom of the form do not raise a reasonable inference that K-Five knew that Gaines was working unauthorized overtime.

Finally, Gaines offers no evidence that, for the almost three years he was periodically working an extra 15 minutes at the start of his shift, he told anyone that he was working unauthorized overtime or that his notations at the bottom of his DDR were meant to indicate as such. Based on the evidence presented, we find that the district court properly granted summary judgment in favor of K-Five on Gaines's FLSA claim.

### III.  Conclusion

For the foregoing reasons, the judgment of the district court is AFFIRMED to the extent that it dismissed Gaines's Title VII claims and his FLSA claim. Regarding Gaines's STAA claim and his Illinois common law retaliation claims, the judgment

is REVERSED and the case is REMANDED for further pro-
ceedings consistent with this opinion.