**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

CARL GENBERG,

      Plaintiff - Appellant,

v.

STEVEN S. PORTER,

      Defendant - Appellee,

and

JEFFREY SPERBER; AL
BAUTISTA; CHERYL HOFFMAN-
BRAY; MICHELE DARNAUD;
PHILIPPE GASTONE,

      Defendants.

_____

NATIONAL WHISTLEBLOWER
CENTER,

      Amicus Curiae.

No. 16-1368

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:11-CV-02434-WYD-MEH)**
_____

Clayton E. Wire, Ogborn Mihm LLP, Denver, Colorado (James E. Fogg,
Ogborn Mihm LLP, Denver, Colorado, with him on the briefs), for
Plaintiff-Appellant.

Robert Reeves Anderson, Arnold & Porter Kaye Scholer LLP, Denver, Colorado (Edwin P. Aro, Holly E. Sterrett, Jenna L. Goldstein, Jamen E. Tyler, Arnold & Porter Kaye Scholer LLP, Denver, Colorado, on the briefs), for Defendant-Appellee.

Stephen M. Kohn, Kohn, Kohn & Colapinto, LLP, Washington, D.C., for Amicus Curiae.

_____

Before **HARTZ**, **HOLMES**, and **BACHARACH**, Circuit Judges.

_____

**BACHARACH**, Circuit Judge.

_____

This appeal grew out of the firing of Mr. Carl Genberg, an executive for Ceragenix Corporation. Mr. Genberg allegedly suspected misconduct by Ceragenix's Board of Directors. When he acted on these alleged suspicions, he was fired.

Mr. Genberg then sued Ceragenix's Chief Executive Officer, Mr. Steven Porter, for

- retaliation under the Sarbanes-Oxley Act of 2002 and

- defamation under Nevada law.

The district court granted summary judgment to Mr. Porter on both claims. We reverse on the Sarbanes-Oxley claim and affirm on the defamation claim.

**I.     Mr. Genberg battles the Board.**

The action arose from a dispute between Mr. Genberg and the Board.

2

## A. A merger results in a proxy for Ceragenix's new shareholders.

In 2005, Mr. Porter and Mr. Genberg worked for a company that merged into Ceragenix. This merger entitled shareholders of the old company to shares in Ceragenix. With the merger, the shares went into escrow and the Ceragenix Board obtained a proxy to exercise voting rights for the escrowed shares. The new shareholders, including Mr. Genberg, believed that the shares would soon be distributed. But Board members continued to use the proxy for roughly five years, reelecting themselves and increasing their own compensation.

## B. Mr. Genberg ghostwrites an email for a Ceragenix shareholder.

Objecting to continued use of the proxy, Mr. Genberg drafted an email under the name of one of Ceragenix's largest shareholders. The email urged the Ceragenix Board to abandon the proxy and allow the shareholders to exercise their own voting rights. When Mr. Genberg drafted this email, the shareholder was part of a group trying to take control of Ceragenix, a move opposed by the Ceragenix Board. The shareholder sent Mr. Genberg's email to the Ceragenix Board on March 2, 2010.

## C. The Board considers the email the next day.

On March 3, the Board met to address the email and suspicion about Mr. Genberg's role. At this meeting, Mr. Porter told the Board that the

3

email had been written by Mr. Genberg to aid another company's attempt to buy Ceragenix. Mr. Porter viewed Mr. Genberg as disloyal, suspecting him of helping the group to seize control of Ceragenix. Similar suspicions led other Board members to suggest that Mr. Genberg be fired. But Mr. Porter thought that the firing would need to wait because Mr. Genberg was actively engaged in fundraising efforts. In the meantime, the Board demanded that Mr. Genberg stop communicating with the shareholder who had sent the March 2 email.

**D.      Mr. Genberg accuses Mr. Porter of insider trading.**

On March 4, Mr. Genberg sent an email to a Board member, accusing Mr. Porter of insider trading. In response, the Board hired an attorney to investigate

- the allegations of insider trading and

- Mr. Genberg's relationship with the group attempting to acquire Ceragenix.

Though the attorney found no evidence of insider trading, he did confirm that Mr. Genberg had been involved in the effort to acquire Ceragenix.

**E.      The Board fires Mr. Genberg, and Mr. Porter tells others of the firing.**

In response, the Board fired Mr. Genberg for cause. Afterward, Mr. Porter reported the firing to a public-relations consultant and two Ceragenix lenders. In these reports, Mr. Porter made four statements about Mr. Genberg that he regards as defamatory:

4

1.	He had acted as "the Judas in house" who facilitated "a hostile takeover."

2.	He had been terminated "for cause" and for "willful breach of fiduciary loyalty."

3.	He had lacked any prior experience but was "a shit disturber deluxe."

4.	He had been "an inside man" who "went over the line."

Mr. Porter also filed a document with the SEC stating that Mr. Genberg had been terminated "for cause."

## II.	Standard of Review

We review de novo the district court's grant of summary judgment, applying the summary-judgment standard stated in Federal Rule of Civil Procedure 56. *ClearOne Comms. v. Nat'l Union Fire Ins.*, 494 F.3d 1238, 1243 (10th Cir. 2007). Under this standard, summary judgment is appropriate if the evidence shows that "there is no genuine issue as to any material fact" and the party moving for summary judgment is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

On an appeal from a grant of summary judgment, we draw all reasonable factual inferences in favor of the non-moving party. *ClearOne Comms.*, 494 F.3d at 1243. A party is thus entitled to summary judgment if the evidence points only one way and no reasonable inferences could support the non-moving party's position. *Auraria Student Housing at the*

5

*Regency v. Campus Village Apartments*, 843 F.3d 1225, 1247 (10th Cir. 2016).

## III.  The Sarbanes-Oxley Claim

Congress passed the Sarbanes-Oxley Act to "protect investors by improving the accuracy and reliability of corporate disclosures." Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745, 745. To further this goal, the Act protects whistleblowing employees of publicly traded companies who tell superiors about a violation of federal securities law. 18 U.S.C. § 1514A. The Act supplies this protection by allowing suit against a publicly traded company or its officers for retaliation. *Id.*

For a prima facie case of retaliation, a plaintiff must show that

- he or she engaged in protected activity,

- the employer knew of the protected activity,

- the plaintiff suffered an unfavorable employment action, and

- the protected activity was a factor that contributed to the unfavorable employment action.

*Lockheed Martin Corp. v. Admin. Review Bd., U.S. Dep't of Labor*, 717 F.3d 1121, 1129 (10th Cir. 2013). If a prima facie case is shown, the defendant can assert a statutory defense known as the "same-action defense." *Id.* at 1130 n.3. This defense requires proof by "clear and convincing evidence" that the same action would have been taken even without the protected activity. *Id.*

6

Mr. Genberg's statutory claim is premised on two separate acts of protected activity: (1) ghostwriting the March 2 email about proxies and (2) writing the March 4 email that accused Mr. Porter of insider trading. Mr. Porter admits that writing the March 4 email constituted protected activity, but he argues that

- the March 2 email did not involve protected activity,

- Mr. Genberg's protected activity did not contribute to his firing, and

- the same-action defense applies.

A reasonable factfinder could view both of Mr. Genberg's emails as protected under Sarbanes-Oxley. Thus, we need not parse which email led to his firing: it is enough under the statute and the summary-judgment standard that a reasonable factfinder could regard either email as a factor contributing to the firing. In addition Mr. Porter forfeited the same-action defense, and a reasonable factfinder could conclude that Mr. Porter had not shown that the Board would have fired Mr. Genberg in the absence of protected activities. These conclusions lead us to reverse the grant of summary judgment to Mr. Porter on the Sarbanes-Oxley claim.

**A.   A factfinder could reasonably regard the writing of both emails as protected activity.**

Mr. Genberg's activities consisted of writing two emails in early March 2010. The first email was sent to the Board on March 2, and the second one was sent on March 4.

7

The March 4 email accused Mr. Porter of giving inside information to a stockholder to rig the price of Ceragenix shares. Mr. Porter admits that writing this email constituted protected activity under Sarbanes-Oxley.[1]

The March 2 email demanded that the Ceragenix Board transfer proxy voting rights to the shareholders. The Board had come to control the proxy rights in November 2005. When receiving the email, the Board had controlled the proxy rights for roughly five years. The email stated that it was "neither fair, just [n]or equitable" for the Ceragenix Board to "retain the voting power over these shares for [five] years and use such power to re-elect the members of the Board of Directors without any consideration for the interests of investors." Appellant's App'x Vol. 4 at 877. This retention of voting power, the email argued, clashed with SEC policies of "sound corporate governance and shareholder accountability." *Id*. at 879.

The district court concluded that writing the March 2 email was not protected activity, reasoning that the email had not "'definitively and substantively'" related to a violation of law. Appellant's App'x Vol. 7 at 1335 (quoting *Fraser v. Fiduciary Trust Co.*, No. 04 Civ. 6958(PAC), 2009 WL 2601389, at *5 (S.D.N.Y. Aug. 25, 2009)). In drawing this conclusion, the court pointed out that the March 2 email had not cited a specific SEC

---

[1]    Mr. Porter makes this admission solely for purposes of summary judgment.

8

rule. This omission led the district court to conclude that the email had not involved protected activity.

The district court applied the wrong standard to determine whether the March 2 email had involved protected activity. Under the proper standard, a factfinder could reasonably characterize writing the March 2 email as protected activity.

### 1. The district court's "definitive and specific" standard is no longer applicable.

The district court stated that the March 2 email was protected only if Mr. Genberg had specifically identified the rule being violated. This statement of the burden was incorrect, for the Administrative Review Board of the Department of Labor has "explicitly disavowed the 'definitive and specific' evidentiary standard." *Lockheed Martin Corp. v. Admin. Review Bd., U.S. Dep't of Labor*, 717 F.3d 1121, 1132 n.7 (10th Cir. 2013). And the Administrative Review Board's interpretation of Sarbanes-Oxley is subject to *Chevron* deference. *Id.* at 1131.

Under *Chevron* deference, we follow the Administrative Review Board's interpretation if it is based on a permissible construction of an ambiguous statute. *Id.* And this construction of the Sarbanes-Oxley Act is permissible because of ambiguity in the statutory text. *See West v. Lynch*, 710 F.3d 121, 129-31 (3d Cir. 2013) (applying *Chevron* deference to the

Administrative Review Board's rejection of the "definitive and specific" evidentiary standard).

Mr. Porter admits that the "definitive and specific" test no longer applies.[2] But he contends that the district court applied the correct standard. We disagree. The district court noted that Mr. Genberg's allegations in the email had not been specific and had failed to "specifically refer to any of the six enumerated laws" in the Sarbanes-Oxley Act. Appellant's App'x Vol. 7 at 1337. This lack of specificity led the district court to conclude that Mr. Genberg had no "reasonable belief that any *specific* SEC rule or regulation was being violated." *Id*. (emphasis added). In light of this conclusion and the rationale, we conclude that the district court used the obsolete "definitive and specific" standard.

**2.    Applying the correct standard, a factfinder could reasonably conclude that writing the March 2 email had entailed a protected activity.**

In *Sylvester v. Parexel International*, the Administrative Review Board stated the correct standard for a protected activity: "[T]he [plaintiff] need only show that he or she 'reasonably believes' that the conduct complained of constitutes a violation of the laws listed" in the Sarbanes-

---

[2]    For purposes of the appeal, Mr. Porter "does not dispute that the Administrative Review Board . . . has 'explicitly disavowed the "definitive and specific" evidentiary standard for Sarbanes-Oxley complaint,' and that numerous circuits have since rejected this standard." Appellee's Resp. Br. at 26 n.9.

10

Oxley Act. No. 07-123, 2011 WL 2517148, at *11 (Admin. Rev. Bd., U.S. Dep't of Labor May 25, 2011). As noted above, we accord *Chevron* deference to the Administrative Review Board's interpretation of the statutory standard. *See Lockheed Martin Corp. v. Admin Review Bd., U.S. Dep't of Labor*, 717 F.3d 1121, 1132 n.7 (10th Cir. 2013). In light of the need for deference, the only four circuits to address the issue have followed *Sylvester*'s articulation of the standard. *Beacom v. Oracle Am.*, 825 F.3d 376, 380 (8th Cir. 2016); *see also Rhinehimer v. U.S. Bancorp Investments*, 787 F.3d 797, 808-09 (6th Cir. 2015) ("Indeed, we have not found a decision by a federal court of appeals that considers and rejects the reasoning in *Sylvester*."). And here, Mr. Porter has not questioned the need to defer to the Administrative Review Board's articulation of the standard.

The *Sylvester* standard contains subjective and objective components. Under the subjective component, the employee "must actually believe" that the conduct raised in the communication is unlawful. *Lockheed*, 717 F.3d at 1132. Under the objective component, the belief must be reasonable. *Id*. Thus, writing the March 2 email would constitute a protected activity if

- Mr. Genberg had actually believed that the Board's retention of the proxy "constituted a violation of relevant law" and

- a reasonable person might adhere to the same belief.

Mr. Porter's appeal brief mentions both the objective and subjective components of the *Sylvester* standard. But his arguments challenge only the

11

subjective component (Mr. Genberg's actual belief that the Board violated an SEC rule by retaining the proxy); Mr. Porter makes no meaningful arguments regarding whether such a belief would have been reasonable. Thus, we focus on the subjective component.

The March 2 email

- accused the Board of holding onto the proxy for "years longer than was ever contemplated" and

- argued that the Board had "deprived [the shareholders] of any voice in the management of Ceragenix."

Appellant's App'x Vol. 4 at 879. Mr. Genberg defends this accusation based in part on SEC Rule 14a-4(d)(2). This rule states that "[n]o proxy shall confer authority . . . [t]o vote at any annual meeting other than the next annual meeting . . . ." 17 C.F.R. § 240.14a-4(d)(2).

Mr. Genberg stated under oath that he had believed that the Ceragenix Board was violating SEC Rule 14 by continuing to rely on the initial proxy.[3] Though Mr. Porter challenges the truth of Mr. Genberg's

---

[3] The concurrence/dissent's critical reading of the March 2 email requires too much under the *Sylvester* standard. The concurrence/dissent cites opinions on the need to avoid litigation over "sham" affidavits, but Mr. Genberg had no obligation to explain the omission of a citation to federal securities law in his March 2 email.

The opinions cited in the concurrence/dissent do not involve an issue like this one. *Kendrick v. Penske Transportation Services* concerned the common-sense rule that affidavits contradicting earlier sworn testimony cannot create "'sham fact issue[s].'" 220 F.3d 1220, 1223 n.2 (10th Cir. 2000) (quoting *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)).

12

sworn statement, the credibility of the statement cannot be resolved on summary judgment. *See Jaxon v. Circle K Corp.*, 773 F.2d 1138, 1140 n.2 (10th Cir. 1985) ("Credibility disputes are particularly inappropriate for summary judgment disposition, especially those involving the affidavit of an interested party concerning facts known only to him."). A reasonable factfinder could conclude that Mr. Genberg was telling the truth when he stated under oath that he had regarded retention of the proxy as a violation of Rule 14. The reasonableness of that factual finding prevents summary judgment on the subjective requirement. *See Sylvester*, 2011 WL 2517148, at *12 (requiring that the employee actually believe that the employer was in violation of the law).[4]

Mr. Porter points out that the email acknowledged that the Board was not violating a particular SEC rule. But a reasonable factfinder could conclude that this part of the email was discussing a different issue. There Mr. Genberg was apparently addressing the purpose of SEC Rule 452,

---

Mr. Genberg had no earlier sworn testimony to contradict, and his affidavit did not conflict with the March 2 email. The other cited opinion, *Hexcel Corp. v. Ineos Polymers*, stated only that conclusory allegations cannot defeat summary judgment. 681 F.3d 1055, 1063-64 (9th Cir. 2012). This proposition does not apply here, for Mr. Genberg's Sarbanes-Oxley claim is governed by the *Sylvester* rule. This rule did not require Mr. Genberg to include a citation to the underlying rule in his March 2 email.

[4] Mr. Genberg also allegedly believed that the Board had violated other SEC rules and Delaware law. We need not address these allegations.

13

which governed proxy voting rules for shares held in street names voted by brokers. The requirements in Rule 452 are distinct from those in Rule 14.

The district court relied not only on the discussion apparently involving Rule 452 but also on Mr. Genberg's sophistication in the industry, suggesting that Mr. Genberg didn't truly believe that the Board was violating a particular SEC rule. Otherwise, why wouldn't he have referred to SEC Rule 14 in the email?

But a factfinder might reasonably conclude that there was little need for Mr. Genberg to name the rule, for it seems to clearly bar use of a proxy for shareholder votes after the next annual meeting. 17 C.F.R. § 240.14a-4(d)(2). In light of Rule 14, a factfinder might reasonably conclude that Mr. Genberg believed that the Board was violating the SEC rule.

\* \* \*

This conclusion would require the court to consider the writing of the March 2 email as a protected activity. As noted above, Mr. Porter does not question satisfaction of the objective requirement (the reasonableness of Mr. Genberg's belief). And a factfinder could reasonably conclude that Mr. Genberg had believed that continued use of the proxy would violate SEC Rule 14.

14

**B. A genuine factual dispute existed on whether the emails had contributed to the firing.**

Mr. Porter contends that neither email had contributed to Mr. Genberg's termination. In our view, however, a reasonable factfinder could conclude that both emails had contributed to the termination.

The fourth element of the statutory claim is that the protected activity contributed to Mr. Genberg's termination. *Lockheed Martin Corp. v. Admin. Review Bd., U.S. Dep't of Labor*, 717 F.3d 1121, 1129 (10th Cir. 2013). This element is "broad and forgiving," requiring the plaintiff to point to "'any factor'" that "'tends to affect *in any way* the outcome of the decision.'" *Id.* at 1136 (emphasis in original) (quoting *Klopfenstein v. PCC Flow Techs.*, No. 04-149, 2006 WL 3246904, at *13 (Admin. Rev. Bd., U.S. Dep't of Labor May 31, 2006)). The contributing factor need not be "'significant, motivating, substantial, or predominant.'" *Id.* (internal quotation marks omitted) (quoting *Klopfenstein*, 2006 WL 3246904, at *13).

**1. A reasonable factfinder could conclude that the March 2 email had contributed to Mr. Genberg's termination.**

The sequence of events supports Mr. Genberg's argument that the March 2 email contributed to his termination. Reacting to the email, the Board took less than a month to begin an investigation, finish it, and fire Mr. Genberg. *See Lockheed*, 717 F.3d at 1136 ("Temporal proximity

15

between the protected activity and adverse employment action may alone be sufficient to satisfy the contributing factor test.").



**Events in March 2010**

Genberg email
Genberg email
Investigator's inquiry includes Genberg
Investigator says Genberg wrote the March 2 email
Genberg fired

2  4  6  19  29

3  5  26

Investigator inquires into insider trading
Board fires Genberg
Board meeting

In fact, Mr. Porter argues that the Board decided to fire Mr. Genberg on March 3, only one day after receiving Mr. Genberg's email: "The undisputed evidence establishes that the Board decided on March 3 that they needed to fire Genberg, but wanted to temporarily delay his firing until Ceragenix secured the capital it needed to survive." Appellee's Resp. Br. at 17; *accord id.* at 43 (arguing that the Board agreed on March 3 that Mr. Genberg "should be fired at a later date").

Mr. Porter argues that the Board fired Mr. Genberg in part because he had concealed his role in the March 2 email. According to Mr. Porter, the Board did not act because of anything that Mr. Genberg had said in the email, pointing out that Mr. Genberg had raised similar concerns in February 2010. But the factfinder had no obligation to credit Mr. Porter's focus on "concealment" or Mr. Genberg's prior expression of concern. The

16

factfinder could reasonably conclude that Mr. Genberg had been fired because of what he had said. After all, Mr. Porter does not suggest that Mr. Genberg had lied about his role in drafting the email. And Mr. Genberg had expressed concern in February 2010 to a different Board member (Mr. Jeff Sperber), not Mr. Porter. Thus, Mr. Porter's alternative explanations for the firing do not justify summary judgment.

### 2. Mr. Porter cannot avoid liability based on a "legitimate intervening event."

On March 4, Mr. Genberg also sent a second email to a Board member, alleging that Mr. Porter had leaked inside information to a stockholder to aid efforts to rig the price of Ceragenix stock. Mr. Porter admits (for purposes of summary judgment) that this email constituted protected activity. But he denies that this email contributed to the termination. Instead, Mr. Porter attributes the firing to a legitimate intervening event: the investigator's determination that Mr. Genberg had breached a fiduciary duty to Ceragenix. *See Feldman v. Law Enforcement Assocs.*, 752 F.3d 339, 348-49 (4th Cir. 2014) (discussing how an intervening event can prevent consideration of protected activity as a significant cause of the termination). We disagree.

To rely on a legitimate intervening event, the adverse action cannot be inextricably intertwined with the protected activity; therefore, Mr. Porter needed to explain Mr. Genberg's termination "without reference to

17

[his] protected activity." *Palmer v. Canadian Nat'l Ry./Ill. Cent. R.R.*, No. 16-035, 2016 WL 5868560, at *34 (Admin. Rev. Bd., U.S. Dep't of Labor Sept. 30, 2016). Mr. Porter did not satisfy this burden. Ceragenix began to investigate Mr. Genberg only after he had written the two emails, and we have already held that a reasonable factfinder could regard the writing of both emails as protected activity.

If we take away both emails, Ceragenix would never have had a reason to investigate Mr. Genberg. Therefore, a reasonable factfinder could conclude that Mr. Genberg's protected activities on March 2 and 4 were inextricably intertwined with his termination. *See id*. at *34-35 (stating that if the protected activity had led the employer to investigate a possible rule violation and then fired the employee for violating the rule, "the protected activity . . . would be 'inextricably intertwined' with the adverse action"). And if the investigation was inextricably intertwined with protected activities, we could not regard the investigation as an "independent" cause for the termination. *See id*. Thus, Mr. Porter cannot avoid liability based on a legitimate intervening event.

> **3.    A reasonable factfinder could conclude that Mr. Genberg would not have been fired in the absence of a protected activity.**

Mr. Porter also invokes the same-action defense. This defense allows the defendant to prevail by submitting clear and convincing evidence that the employee would have been fired even without the protected conduct.

18

*Lockheed Martin Corp. v. Admin. Review Bd., U.S. Dep't of Labor*, 717 F.3d 1121, 1129 n.3 (10th Cir. 2013). Mr. Porter forfeited this defense, and it would not justify summary judgment even if the issue had been preserved.

Mr. Porter did not assert this defense either in his Answer[5] or in his summary-judgment briefs. Mr. Porter points out that he argued that Mr. Genberg's protected activity had not contributed to his termination and asserts that this argument was sufficient to preserve his same-action defense. We disagree. The "contributing factor" inquiry considers everything that took place and requires the employee to prove that the protected activity was taken into account as a reason for the firing. In contrast, the same-action defense requires the employer to show that it would have taken the same action even if there had never been a protected

---

[5] Mr. Porter's Answer appears to expressly disavow the relevance of the same-action defense:

> 120. *Once a Plaintiff has established a prima facie case, then . . . the employer [must] demonstrat[e] by clear and convincing evidence that it would have taken the same adverse employment action in the absence of the plaintiff's protected activity.*
>
> RESPONSE:   Paragraph 120 states Plaintiff's own legal analysis and thus no response is required; denied to the extent this allegation is contrary to the plain language of [the Sarbanes-Oxley Act] and relevant case law; **otherwise denied that this has any relevance to Porter's actions**.

Appellants' App'x Vol. 3 at 658 (citation omitted) (second emphasis added)

19

activity. *See Palmer v. Canadian Nat'l Ry./Ill. Cent. R.R.*, No. 16-035, 2016 WL 5868560, at \*12 (Admin. Rev. Bd., U.S. Dep't of Labor Sept. 30, 2016) (explaining this difference between the two inquiries); *see also Formella v. U.S. Dep't of Labor*, 628 F.3d 381, 389 (7th Cir. 2010) (distinguishing the "contributing factor" inquiry and the same-action defense).

Application of the two tests would entail different inquiries. Under the "contributing factor" inquiry, the question is whether the content of Mr. Genberg's communications had been a factor in his termination. But under the same-action defense, the court would consider what would have happened if Mr. Genberg had never written either email: No one would have been investigating Mr. Genberg, so the Board would never have known that Mr. Genberg had done anything wrong. Thus, Mr. Porter's challenge in district court on the "contributing factor" element did not preserve reliance on the same-action defense.

But let's assume, for the sake of argument, that this defense was preserved. Even with this assumption, Mr. Porter could not justify the award of summary judgment. To prevail on this defense, Mr. Porter needed to show that Mr. Genberg would have been fired even if he had not written either email. Mr. Genberg might have been fired even if he had not written either the March 2 or March 4 email. But that possibility does not entitle Mr. Porter to summary judgment on the Sarbanes-Oxley claim.

20

On this issue, a reasonable factfinder could have gone either way. The March 2 email led the Board to conclude that Mr. Genberg could be terminated "for cause," and Mr. Porter acknowledges that the Board decided to fire Mr. Genberg on March 3 based on his email one day earlier. In addition, the March 4 email led the Board to order an investigation that ultimately confirmed Mr. Genberg's role in the March 2 email. The Board purported to rely on this confirmation to fire Mr. Genberg. Thus, it is unclear whether the Board would have fired Mr. Genberg absent the March 2 and March 4 emails. In light of this uncertainty, Mr. Porter could not obtain summary judgment even if he had preserved the same-action defense.

\* \* \*

The district court granted summary judgment to Mr. Porter on Mr. Genberg's Sarbanes-Oxley claim. We reverse this grant of summary judgment. A factfinder could reasonably conclude that Mr. Genberg had engaged in protected activity by writing the email on March 2, and Mr. Porter argues that the Board decided the next day to eventually fire Mr. Genberg. With further protected activity on March 4, the Board decided to investigate Mr. Genberg himself. This investigation ultimately led the Board to fire Mr. Genberg. In these circumstances, a reasonable factfinder could conclude that Mr. Genberg's protected activities had contributed to his firing.

21

## IV. Defamation Claim

Mr. Genberg also sued Mr. Porter for defamation based on statements to a Ceragenix consultant, Ceragenix lenders, and the SEC. This claim fails as a matter of law.

The parties agree that Nevada law applies to the defamation claim, and Nevada recognizes a common-interest privilege. *Lubin v. Kunin*, 17 P.3d 422, 428 (Nev. 2001). The privilege applies if

- the defamatory statement was made in good faith and

- the writer and the reader share a common interest in the content of the statement.

*Id*. Mr. Genberg admits that the privilege applied to Mr. Porter's defamatory statements and argues only that Mr. Porter abused the privilege.[6] In support, Mr. Genberg contends that a defendant can abuse the common-interest privilege other than through malicious statements.

The privilege is abused when a defendant "publishe[s] with malice in fact or otherwise abuse[s] the privilege." *Pierson v. Robert Griffin Investigations, Inc.*, 555 P.2d 843, 843 (Nev. 1976). But the privilege is abused only if the defendant acted "without belief in the statement's probable truth." *Circus Circus Hotels, Inc. v. Witherspoon*, 657 P.2d 101, 105 n.2 (Nev. 1983).

---

[6] Mr. Genberg also argued in his opening brief that the privilege did not apply to Mr. Porter's SEC filing. But Mr. Genberg admitted in his reply brief that he had failed to preserve this issue in district court.

Mr. Genberg does not argue that Mr. Porter doubted the truth of what he said. To show abuse of the privilege, Mr. Genberg needed evidence that Mr. Porter

- had thought his statements were false or

- had disregarded their falsity.

*See id.* Because Mr. Genberg did not present such evidence, Mr. Porter was entitled to summary judgment on the defamation claim.

## V. Conclusion

A trier of fact could reasonably find satisfaction of the elements of a Sarbanes-Oxley claim. Doing so, the trier of fact could reasonably view the March 2 and March 4 emails as protected activities that had contributed to Mr. Genberg's termination.

Mr. Porter newly asserts the same-action defense, but a reasonable factfinder could conclude that Mr. Genberg would not have been fired in the absence of the March 2 and March 4 emails. As a result, Mr. Porter is not entitled to summary judgment based on the same-action defense. Because the district court found otherwise, we

- reverse the district court's grant of summary judgment to Mr. Porter on the Sarbanes-Oxley claim and

- remand for further consideration of this claim.

But on the defamation claim, we affirm the district court's award of summary judgment to Mr. Porter. His statements fell under the common-

23

interest privilege, and Mr. Genberg has not presented evidence of an abuse

of the privilege.

16-1368, *Genberg v. Porter*

**HARTZ**, Circuit Judge, concurring and dissenting:

I concur in the panel opinion's affirmance of the summary judgment on the defamation claim; but I respectfully dissent from the reversal of the summary judgment on the claim of retaliation under the Sarbanes-Oxley Act. I would affirm the district court on the ground that no reasonable juror could infer that Mr. Genberg subjectively believed that the March 2, 2010 email to the board of directors of Ceragenix Pharmaceuticals, Inc. (the Salamon email) was reporting a past, or even potential, violation of federal securities law. Although Mr. Genberg, the author of the email, had been a lawyer sophisticated in securities law, the email never states that any conduct by anyone had violated or would violate federal securities law. And the email's references to the proxy, which the panel opinion suggests may have violated an SEC regulation, complain about the proxy only in terms of bad policy or corporate management. Nor can Mr. Genberg's affidavit, submitted long into this litigation and almost six years after the email, carry the day. Its convoluted language fails to allege any prior violation of securities law and, more importantly, it suffers the fatal defect of other sham affidavits in failing to explain why, if Mr. Genberg believed there was a violation of securities law, he failed to say that in the email.

An important part of the context of the Salamon email is that Mr. Genberg had been a lawyer specializing in securities and business litigation. In the 1990s he had been the lead plaintiff's attorney in a multidistrict securities-fraud action. Perhaps, though I doubt it, a sheepish unsophisticated person who believed that Ceragenix had been

violating or was about to violate federal securities law could have authored the Salamon email; but it beggars imagination to conceive that Mr. Genberg had that belief when he sent the email.

The purpose of the Salamon email, as stated in its opening sentence, was "to request the immediate transfer of voting rights in the proxy you hold over shares of Ceragenix [Pharmaceuticals]." Aplt. App. Vol. 4 at 877. I can think of no better way to encourage the directors to comply with a request than to say that what is being requested is commanded by federal securities law. But the email never says that.

On the contrary, the email suggests that the request is not a demand to comply with federal law. The reasoning behind the request is first presented in the second paragraph of the email. The initial sentence of that paragraph begins: "This request is based, in part, on recent SEC changes to proxy voting rules (affecting the ability of shares held in 'street name' to be voted by brokers in uncontested elections for the Board of Directors)," and then quotes the SEC's stated rationale for the changes. *Id.* This may look like an assertion that securities law is being violated, but the second sentence explains: "While the new proxy rule is not directly applicable (as it applies to share[s] held in street name voted by brokers) the policy rationale is clearly on point." *Id.* Thus, the email explicitly states that the recent change to proxy rules does not apply. And the following sentence states: "We believe that [it] is neither fair, just or equitable that you retain the voting power over the shares for 5 years and use such power to re-elect the members of the Board of Directors without any consideration for the interests of investors." *Id.* Why would anyone, much less a lawyer, make a plea on the basis of

2

fairness and justice and equity if he thought that federal law required the requested action? Why would a person believing that conduct he wishes to halt is in violation of federal law, make no mention of that belief but commence his argument by stating that another law does not apply and conclude by seeking justice and fairness? Such extreme pussyfooting is not rational, and no reasonable person could believe that Mr. Genberg was acting in that manner.

The next few paragraphs of the Salamon email (consisting largely of quotations from the Ceragenix 2008 proxy statement) describe the history of the escrowed shares and accompanying proxy and explain why the continuance of the proxies is unfair to those sending the email. The eighth paragraph of the email ends by complaining that the proxy has been kept "alive for a period [of] years longer than was ever contemplated and has thus deprived us of any voice in the management of Ceragenix. Whose interest is the Board accountable to when it votes the proxy over what constitutes nearly 66% of the voting power in Ceragenix? This is the antithesis of sound corporate governance and shareholder accountability." *Id.* at 879. The panel opinion characterizes the last quoted sentence as follows: "This retention of voting power, the email argued, clashed with SEC policies of 'sound corporate governance and shareholder accountability.'" Maj. Op. at 8. But I cannot find in that paragraph (or anywhere in the email except the previously quoted portion of the second paragraph referring to an admittedly inapplicable proxy rule) any suggestion that the email was referring to SEC policies, much less federal securities law, when it spoke of corporate governance and shareholder accountability. There is a reference to "sound corporate governance" two paragraphs later, but there the

3

email invokes Delaware law, not federal law: "We believe that sound corporate governance requires annual shareholder meetings as required by Title 8 Section 211 (C) of the Delaware General Corporate Laws." Aplt. App. Vol. 4 at 879. Mr. Genberg was not shy about invoking applicable law in this email.

Then there is the final paragraph of the email. It is incomprehensible to me how Mr. Genberg could have written the paragraph as he did if he believed there was a violation of federal securities law. It reads:

> We look forward to your prompt action in redressing this issue. We hope that you share SEC Chairman Shapiro's view that voting rights should be exercised by those with an economic interest in the company. We ask that you immediately transfer to us the proxy granted to you over the common shares of Ceragenix so that we may exercise this voting power until such time that Osmotics completes its long delayed plan of distribution for these shares. We trust that it will not be necessary to bring this matter before the Delaware Court of Chancery.

*Id.* Rather than referring to federal law, he refers to the "view" of the SEC chairman. And rather than threatening action based on federal law, he threatens litigation in the Delaware chancery court. Is it really reasonable to believe that Mr. Genberg wrote this with the belief that the action he was demanding was required by federal securities law?

I am not saying that Mr. Genberg's claim is deficient just because the email failed to cite to a specific SEC rule that had been or might be violated. The problem is deeper than that. Everything about the email conveys the author's belief that the challenged behavior was not governed by federal securities law.

What about Mr. Genberg's affidavit, executed on February 6, 2016, just shy of six years after the Salamon email, in response to Mr. Porter's motion for summary

4

judgment?  The panel opinion construes the affidavit as asserting that Mr. Genberg had believed that Ceragenix was violating  SEC Rule 14a-4(d)(2), which states that "[n]o proxy shall confer authority . . . [t]o vote at any annual meeting other than the next annual meeting . . . ."  *See* Maj. Op. at 12.  I will not challenge that construction, although I note that the affidavit is not that specific (referring only to "Rule 14," Aplt. App. Vol. 6 at 1110) and that the record indicates that there could not have been a prior violation of Rule 14a-4(d)(2) because Ceragenix had held only one annual shareholder meeting after execution of the proxy.

The fundamental flaw in the affidavit arises from a different omission.  It utterly fails to explain why, if Mr. Genberg believed at the time of the Salamon email that Ceragenix had engaged or was going to engage in conduct contrary to federal securities law, he omitted any mention of that belief in the email.  This court has previously recognized how the legal process can be gamed by last-minute affidavits submitted in response to motions for summary judgment.  Even a sincere litigant can convince himself years (here six years) after the event, contrary to the previously developed record, of the truth of a matter that now appears to be essential to survival of his claim.  Although "sham affidavit" opinions typically address conflicts between such an affidavit and prior deposition testimony, the rationale is that the affiant had every reason to disclose the information earlier, so the last-minute affidavit should at least explain the failure.  To prevent "sham" affidavits from improperly prolonging litigation, we require the affidavit to explain why the affiant did not mention the matter at an earlier time when one would fully expect it to have been mentioned.  *See, e.g., Kendrick v. Penske Tranps. Servs., Inc.*,

5

220 F.3d 1220, 1223–24 n.2 (10th Cir. 2000) (noting no attempt to clarify prior testimony); *Franks v. Nimmo,* 796 F.2d 1230, 1237 (10th Cir. 1986); *cf. Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1063–64 (9th Cir. 2012) ("narrow, conclusory denials" of knowledge in affidavit could not defeat summary judgment). But Mr. Genberg's affidavit provides absolutely nothing in explanation of why he failed to mention in the Salamon email the possibility of a violation of SEC proxy rules. His conclusory assertion that he had a belief six years earlier does not create a genuine dispute of material fact.

Perhaps in the long run it does not matter whether we determine that Mr. Genberg was engaged in protected activity when he sent the Salamon email. The second element of his retaliation claim under the Sarbanes-Oxley Act is that Mr. Porter knew that Mr. Genberg was engaging in protected activity. *See Lockheed Martin Corp. v. Admin. Review Bd., U.S. Dep't of Labor*, 717 F.3d 1121, 1129 (10th Cir. 2013). As explained above, no reasonable person would think that the Salamon email was alleging a violation of federal securities law. Summary judgment appears inevitable on that ground. *See Petersen v. Utah Dep't of Corrs.*, 301 F.3d 1182, 1188–89 (10th Cir. 2002).

Finally, although Mr. Porter concedes that Mr. Genberg's March 4 email alleging insider trading was protected activity, there is no genuine dispute that Mr. Genberg would have been fired even had there been no March 4 email.

6